2009 OK CR 19

**Gordon Todd SKINNER, Appellant**

v.

**The STATE of Oklahoma, Appellee.**

No. F–2007–1101.

Court of Criminal Appeals of Oklahoma.

June 11, 2009.

Patrick Adams, Thomas A. Mortensen, attorneys at law, Tulsa, OK, attorneys for defendant at trial.

Jack Thorp, assistant district attorney for Tulsa County, Tulsa, OK, attorney for the State at trial.

Gloyd L. McCoy, McCoy Law Office, Noble, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, attorney general of oklahoma, Christy Baker, assistant attorney general, Oklahoma City, OK, attorneys for appellee on appeal.

## OPINION

CHAPEL, Judge.

¶ 1 Gordon Todd Skinner was charged and convicted of Conspiracy to Commit Kidnapping AFCF, under 21 O.S.2001, § 421 (Count I); Kidnapping AFCF, under 21 O.S.2001, § 741 (Count II); and Assault and Battery with a Dangerous Weapon AFCF, under 21 O.S.2001, § 645 (Count III), in the District Court of Tulsa County, Case No. CF–2003–4213.[1] In accord with the jury's recommendation, the Honorable Gordon D. McAllister sentenced Skinner to imprisonment for thirty (30) years and a $10,000 fine on Count I, imprisonment for sixty (60) years and a $10,000 fine on Count II, and imprisonment for life and a $10,000 fine on Count III, to be served consecutively.[2] Skinner is properly before the Court on direct appeal.

### FACTS

¶ 2 Even a careful review of the record in this case leaves unanswered many questions about what exactly happened to eighteen-year-old Brandon Green, beginning over the Fourth of July weekend in 2003, at the hands of defendant Gordon Todd Skinner ("Skinner"), and with the assistance of his co-defendants Krystle Ann Cole Skinner ("Cole") and William Earnest Hauck ("Hauck").[3] It is even more unclear why it happened.

¶ 3 What is fairly clear, however, is that Green joined Skinner and Cole, who were staying at the downtown Tulsa Doubletree Hotel, in early July of 2003.[4] Skinner was

1. The Judgment and Sentence documents in this case fail to accurately record that in regard to each of Skinner's three counts, he was convicted and sentenced "After Former Conviction of a Felony" (AFCF). This Court herein orders correction of these documents accordingly.

2. This Court notes (and discusses in connection with Proposition VII) that none of the crimes of which Skinner has been convicted fall under the "85% Rule" for the serving of his sentences.

3. Cole and Hauck were charged along with Skinner in Counts I and II, but were not charged in Count III. Both Cole and Hauck testified for the State against Skinner at his solo trial. They both testified that they did not have any "deal" with the State, in exchange for their assistance and testimony, but that they hoped their assistance would be given some consideration in their cases.

4. Cole and Skinner were staying in Rooms 1409 and 1411, which were adjoining, even though the hotel was unaware at the time that they were using Room 1411. Evidence presented at trial indicated that Skinner had previously hosted parties in these same two rooms.

known for hosting gatherings at this and other locations, where illegal psychedelic drugs would be given out, often his own concoctions and often as part of a pseudo-religious ceremony that Skinner would lead. Green was expecting to party with Skinner and Cole and to prepare for some kind of business venture with Skinner, which involved harbor dredging work in the Caribbean. Green considered Skinner to be his "friend" and referred to Cole, whom he had been dating for a few months, as his "girlfriend," even though she had apparently just married Skinner. Cole had previously been involved with Skinner, but she had recently been trying to "get away" from him, with the help of Green, because Skinner was so violent and controlling.[5]

¶ 4 It is also clear that on July 3, 2003, at the request of Skinner, Green drove from Tulsa to Oklahoma City to pick up Bill Hauck, whom Green had not met previously, and bring him back to the hotel. Hauck was a truck driver and had a long history of working for and with Skinner, and he expected to be involved in the dredging venture. Hauck had his own room on a different floor and was in and out of the hotel and Skinner's rooms over the next five days. Meanwhile

Cole remained in and around the adjoining 14th floor rooms during this same time. The exact extent of Hauck and Cole's willing participation in the subsequent kidnapping and torture of Green at the hotel was a matter of some dispute at trial, but there was no dispute among the testifying witnesses who were there at the time—Green, Hauck, Cole, and later Kristi Roberts—that Skinner was very much running the show.[6] On the other hand, Hauck and Cole freely admitted that they did nothing to try to stop Skinner and that they made no effort to get Green any kind of help, even though they could see his injuries and hear him moaning in pain and begging for help.[7] Nor did they contact law enforcement authorities or anyone else on Green's behalf.

¶ 5 Brandon Green remembers that on July 4, 2003, he voluntarily ingested several of what Skinner described as "the Eucharist," believing that the Catholic communion wafers that Skinner provided would be laced with LSD, as on previous occasions when Skinner had given them to Green. Green expected that the wafers would cause him to "trip," but instead he was rendered completely unconscious.[8] Green testified that his

---

5. Cole testified at trial that she and Skinner had always had an "open relationship," which included dating other people even when they were "together." She testified that in early July of 2003, she still considered Green to be her "boyfriend," even though she had a "vague memory" of marrying Skinner on June 27, 2003, while under the influence of drugs. Cole testified that she was in love with Green at the time and that he was "shocked" that she married Skinner. Cole described Kristi Roberts as Skinner's "girlfriend" during this same time period. And Roberts testified at trial that when she came by Room 1409 on the night of July 2, 2003, Skinner, Cole, and Green were all sleeping together in a single bed.

6. Skinner did not testify. Both Cole and Hauck testified that they were afraid of Skinner and that in addition to being large, strong, violent, and manipulative, Skinner was believed to possess certain mental "powers" to control other people. Hauck was reluctant to claim that he thought Skinner had actual "mind control" over him, but Hauck did testify that for some reason he did as he was told regarding Green, without thinking for himself, and that he "was afraid the next needle would be mine." Even Green testified that he believed Skinner had the power to make

people in his presence feel like they were "tripping" on psychedelic drugs, without having taken any such drugs, and that he and Cole had both experienced this phenomenon in Skinner's presence. Skinner told the people around him that he was "a government agent," and his friends knew that he had a history of working with federal DEA agents.

7. Hauck also admitted that early on in the ordeal, he helped Skinner bind Green with duct tape, after being told that Green (who was unconscious) had had a "bad trip" the previous night and had gotten violent and destructive. Hauck testified that Skinner later warned him that he could never claim that he was not "involved," since Hauck had participated in binding Green.

8. Cole likewise testified that Green's reaction to the wafers provided by Skinner was very unusual and unexpected. Cole testified that she had an extensive history with and knowledge of psychedelic drugs, based upon actually trying 20 or 30 different kinds herself, learning about them from Skinner and observing people at his drug parties, reading numerous books about them, and even publishing her own book, entitled "Lysergic" (as in lysergic acid or "LSD").

next memory was of waking up naked on the hotel bathroom floor, with his hands, legs, and mouth duct-taped, and with Skinner standing over him, kicking him in the groin area as hard as he could and saying, "You should never have touched my fiancée; you should never have touched my fiancée."[9] Green remembers that he eventually passed out during this assault and that when he woke up, Skinner was kneeling over him with a hypodermic needle, injecting something into his penis. Green's comprehension then got "extremely blurry," and he has very few clear memories of the incredible torture that he was subjected to over the next four days at the Tulsa Doubletree and then at a Houston area motel after that.

¶ 6 Evidence presented at trial established that the torture at the Tulsa hotel included numerous and repeated injections by Skinner into Green's penis, testicles, buttocks, and other parts of his body, with the apparent dual purpose of permanently disabling and disfiguring Green sexually and of keeping him in a prolonged state of unconsciousness, while he was being physically, sexually, and emotionally assaulted by Skinner.[10] Skinner also brutally punched and kicked Green in the genitals, lifted Green's unconscious body up off the bed by grabbing him at the base of his genitals,[11] and wrapped a phone cord about Green's penis, put his foot on Green's stomach, and jerked until he heard "the cartilage snap."

¶ 7 Kristi Roberts testified at trial that she met Green, Skinner, and Cole earlier in 2003, that she had taken psychedelic drugs provided by Skinner, including "the Eucharist," and that she had a "very close friendship" with Skinner. Roberts testified that she stopped by the hotel during the early morning hours of July 2, 2003, but then did not return to the hotel until late evening on July 5, after being picked up by Hauck in Green's car. After chatting with Skinner and Cole, Roberts discovered Green lying on the bed in Room 1411 "in a sedated state."[12] Skinner and Cole told her that Green had "tried to keep up with [Skinner] taking the Eucharist." Roberts left again that night and did not return until the next night.

¶ 8 When Roberts arrived on July 6 and asked where Skinner and Green were, Cole directed her to Room 1411, saying, "It's not as bad as it looks." Roberts found Green lying on the bathroom floor, with duct tape around his head and face, his hands duct-taped to his feet behind him, and with a "KFC" cup over his penis. Roberts testified that Green was very upset, "tripping really hard," and that when she finally got the duct tape off his mouth, he was talking but not making a lot of sense.[13] Roberts testified that Cole told her that Green had "gotten into something" (the green liquid) and that Roberts should wear socks on her hands and not touch any of the substance that was on Green.

¶ 9 Roberts testified that as she gave Green a bath, he started saying that "his balls were hurting" and that Skinner had "shot him in the balls." Roberts could tell that Green was in a lot of pain and could see

9. Hauck testified that Skinner said, "I'm getting even. I don't let anybody sleep with my wife."

10. Skinner bragged at the time that the genitalia injections he was giving Green would cause his genitals "to shrivel up and fall off" and that other substances he was injecting Green with would "erase his memory" about what had happened. Cole testified that it was "normal for [Skinner] to give people stuff if he wanted to knock them out." Cole also testified that she was aware of a number of the substances that Skinner injected into Green, including the downers Valium and Klonopin. She also testified that Skinner put a green liquid substance into Green's mouth while he was knocked out, which got on Green's face. Cole noted that when she got a drop of this substance on her arm, it caused her arm to go numb and stay numb for

20 minutes or more, which really concerned her. Skinner told her that the green liquid was "Salvinorin A or C."

11. Hauck testified that after lifting Green up off the bed this way, Skinner commented, "He's not going to ever feel anything."

12. Roberts noted that Green was wearing a shirt at that time and that the bottom half of his body was under the covers.

13. Roberts testified that Green suddenly started "freaking out" and that when she looked behind her, Skinner was standing there holding a steak knife. Green seemed very afraid of Skinner, but allowed Roberts to use the knife to slowly cut off the duct tape.

that his testicles were very swollen and that his penis was injured. She got Green back into bed and tried to comfort him and to convince Skinner and Cole to take him to a hospital, but they refused, saying that Green had injured himself during a "bad trip."[14] As Green became more lucid over the next few hours, he started telling Skinner that he "was sorry he slept with his girlfriend" and that he "thought that they were friends."

¶ 10 Green begged Roberts to find out if Cole was involved in what was happening to him; so Roberts went down to the lobby with Cole for a few minutes to talk to her. By the time Roberts returned, Green was laying on the bed drooling, no longer able to speak, and Skinner told her that he "just gave him something to put him to sleep."[15] After sitting with the now-"sleeping" Green for a while, to make sure that he was still breathing, Roberts left and went to sleep in a different room on the 15th floor. When Roberts woke up the next morning, Cole told her that Green had left and was probably going to the police. Roberts testified that she believed Green had left on his own, since he was no longer in Room 1411 and his car keys had been taken from the place where she had hidden them in that room. Roberts "assumed everything was going to be fine," after Green recovered from his trip.

¶ 11 Earlier that same morning of July 7, 2003, Skinner determined that Green needed to be moved out of Room 1411, because a housekeeper had discovered that they were using that room (without paying for it) and had seen Green on the bed, and also to get Green away from Roberts. Skinner directed Hauck and Cole to move Green, then barely conscious, to Hauck's room on the eighteenth floor and to tell Roberts that Green had woken up and left the hotel.[16] Skinner then ordered Hauck, Cole, and Roberts to clean up the fourteenth floor rooms, which they did. After that Skinner sent Roberts off with his luggage to get him a room at another hotel, and she did not return to the Doubletree. Skinner gave Green further injections in the new room, in order to keep him from "waking up."

¶ 12 On July 8, 2003, Skinner hatched a plan that Green's body would be totally shaved and then dumped in a remote area of Texas.[17] Skinner told Hauck to cut Green's long, blond, curly hair, which he did. Skinner then sent Hauck to find a large wardrobe box and a bellman's cart. Hauck testified that when he returned, Green's head had been completely shaved and that Skinner and Cole were also shaving his legs and eyebrows.[18] Hauck testified that after they finished, Skinner poured alcohol and Epsom salt on Green's body, claiming that it would destroy DNA evidence.[19] After Skinner gave Green an additional injection to keep him "out," they dressed him, put him in the box, put the box on the hotel cart, rolled the cart out to Green's own car, which was parked in the hotel parking lot, wrapped him in a blanket, and then buckled Green's limp body into the front passenger seat. Skinner directed Hauck to drive to the Houston area, where Skinner would join them later, and gave Hauck an additional syringe to use on

14. Roberts acknowledged that she could have called the police, but didn't, because she was afraid of bringing "negative attention" to the group.

15. Hauck testified that Skinner was concerned because Green was talking to Roberts and getting more coherent; so he asked Cole to get Roberts out of the room for a while. While they were gone, Hauck saw Skinner give Green an injection in his buttocks that rendered him "almost catatonic."

16. Hauck testified that he had to take duct tape off Green's wrists and legs before they could move him, which had apparently been re-applied after Roberts removed it the previous day, and that Green was "out of it" at the time they moved him and left him in the new room.

17. Hauck testified that Skinner "wanted to leave him down in South Texas, and he wanted him to look like he was homosexual, and [Skinner] said the good old boys of Texas wouldn't pursue it, just another homosexual."

18. Hauck testified that Cole was laughing and mocking Green as she shaved his eyebrows and that she seemed to be having "fun." Cole, on the other hand, testified that Skinner did all the shaving and that she feared Hauck, as well as Skinner, and that they both ordered her around.

19. Cole testified that Epsom salt was placed on Green's genital area and that it was bleach that was then poured over him, causing horrible, irritating fumes to fill the room.

Green, in case he started waking up on the way.

¶ 13 Hauck testified that he never injected Green with anything, but that when Green started to wake up during the trip, Hauck hit him twice on the face and that Green "was in enough of a weakened condition [that] it knocked him out."[20] Hauck testified that they arrived at a motel in the Houston area during the early morning hours of July 9, that when Green started waking up again, he tied him down to the bed in the room, and that they were joined by Cole and Skinner that afternoon. Green was held in this room until the evening of July 10, 2003. During this time Skinner gave him additional injections to keep him unconscious and ordered Hauck to give Green oral antibiotics, claiming that it would help heal the injection marks.

¶ 14 During this time Skinner also prepared a foul-smelling "tea," which he both forced Green to drink and injected him with, causing Green to vomit violently. Both Hauck and Green testified about a particularly disturbing thing that Green vomited up, which had little worm-like things inside it, and that Skinner claimed was a "parasite sack."[21] In addition, and at the direction of Skinner, Green's eyes were covered and he was told that if he took the covering off, his retinas would be burned. Skinner then pretended to be a Swedish doctor, who had come to "help" Green, but who actually tormented him and put suppositories and perhaps other things in Green's anus.[22]

¶ 15 Late in the day on July 10, Skinner directed Hauck to take Green and dump him, along with his car, in a deserted area in rural Texas, where it would be unlikely that Green would be found or get help quickly.[23] Cole was directed to follow Hauck, who was driving Green's car, and to bring Hauck back after he had dumped Green. Green was given a final injection by Skinner before they left. Cole and Hauck stopped at a convenience store on the way to buy some water and chocolate candy to leave with Green, since they knew that he had not had any food and only limited fluids since the whole ordeal began. They then drove to an area along a highway outside of Texas City, Texas. Hauck testified that he decided to leave Green in a field along the highway, which was "between a busy county road and a busy interstate," because he believed it would give Green "the best chance."[24] Hauck then placed Green, still nearly catatonic, on a blanket on the ground next to the car, leaving the keys to the car and the food and water inside, with the doors locked.[25]

¶ 16 Green testified that his first memory that night was of hearing his car door open and being picked up by Hauck, "like you would a little baby," and being placed down in the grass, and that he was so grateful that he was going to be allowed to sleep. When Green woke up later that night, Hauck was gone. Green crawled to his car, only to find that even though his car keys were visible on the driver's seat, all the doors were locked;

20. Green had only foggy memories of most of his ordeal, but he did remember certain events, such as when Hauck hit him during the drive. Nevertheless, at trial Green described Hauck as mostly a comforting, reassuring, and even "gentle and nonaggressive" presence, that Hauck gave him Gatorade, and that Hauck was only "mean" to him when Skinner was around.

21. Green testified about the horrible tea that he was forced to drink and that afterward he threw up things that he called "jellyfish," because of their see-through appearance, which had "like little worms ... swimming around inside" of them.

22. Cole testified that Skinner's "Swedish doctor" was intended to confuse Green about what had happened and that Skinner was regularly giving Green a combination of psychedelics, barbitu-

rates, opiates and "anything that he could to make [Green] not be able to remember." Green testified that he eventually recognized the voice of the "Swedish doctor" as being Skinner and that the things that Skinner shoved up his anus caused a tear in his anus.

23. Skinner told Hauck that he wanted Green dropped off around dusk, so that the mosquitoes and chiggers would be active and would "cover the injection sites."

24. Hauck then acknowledged, however, that a hospital would have the place where Green truly had "the best chance" to survive.

25. Hauck testified that he was certain that he left the passenger side door unlocked, but when Green woke up and when authorities later found the car, all the doors were locked.

and he wept. The next morning Green began the long, painful crawl to the highway, since he could hear traffic. Green testified that he would crawl a few feet and would then pass out, before waking up to crawl a few more feet, that he used his shoes as a pillow, and that he brought along the blanket he had found in the grass.[26]

¶ 17 Green's naked and nearly lifeless body was found along the Texas highway by Texas City police officer Neal Mora, around 8:00 a.m., on July 11, 2003. Mora testified that he wasn't sure what he was seeing at first, that Green had a blanket around his lower half, and that he was "very weak and just completely, completely pale." When he looked more closely, Mora could see numerous cuts on Green's head and bruising all over his body. Mora commented that Green looked "pretty horrific." Green was taken to the Mainland Medical Center in Texas and put in the intensive care unit.

¶ 18 At trial the jury was shown a video of Green, which was taken at the hospital within a few hours after he was found.[27] The jury was also shown pictures of Green's battered body, including extensive bruising and ligature marks from being tied up and his incredibly swollen, discolored, and damaged genitals. Green testified that he spent about a week in the hospital, during which time his lung collapsed due to the trauma he had endured. He noted that he was unable to walk even when he was released and that he remained in a wheelchair for months. In addition, Green testified that even though it had been nearly three years since the ordeal, he continued to need weekly medical care and that he had constant pain and nerve damage in his groin area and a large mass in his left testicle. Green noted that he had done a lot of research, including parasite research, trying to figure out what exactly Skinner had injected him with, because he had suffered from numerous illnesses since the kidnapping and been unable to fully recover. In particular, Green testified that despite his concerted efforts to "man up" since the kidnapping, he remained unable to put on weight or gain muscle mass.[28]

## ANALYSIS

¶ 19 In Proposition I, Skinner asserts that his convictions in the current case must be reversed and dismissed because they were obtained in violation of binding immunity agreements that he entered with the federal government. More specifically, Skinner maintains (and has maintained since shortly after the filing of this case) that the State of Oklahoma is prohibited from prosecuting him for the violent crimes committed against Brandon Green in July of 2003, because he received a grant of immunity from the federal government in October of 2000, which was renewed in January of 2003 when he testified in a federal drug and money laundering case in Kansas.[29] Skinner maintains that the current State prosecution was irreparably taint-

26. Green testified that he left his clothes in the field, since they were so dirty and nasty.

27. In the video Green struggles to speak and is obviously very weak, very sick, and very confused. He talks about having a lot of trouble with his memory, which he attributes to taking too many Eucharists, and he does not remember much about what happened, though he does remember that Skinner gave him an injection in his penis while at the Tulsa Doubletree. Green also talks about the awful night that he spent in the field after "William" left him, that he "cried all night," that he was so sick, that he really struggled to take off his pants, because he had to go to the bathroom, and that he kept falling and hoping someone would come help him.

28. Almost five months after Skinner's trial and convictions, Cole pled "no contest" to accessory after the fact to kidnapping. Later, on March

26, 2007, she was placed on probation for five (5) years, ordered to pay $52,109 in restitution, and given a deferral of sentencing until March 26, 2012. One day after Cole's plea, Hauck likewise pled guilty to accessory after the fact to kidnapping. He was immediately sentenced, in accord with a plea agreement and based upon only one of his five prior convictions, to a suspended sentence of ten (10) years, without supervision, a $250 fine, and a $5,000 victim's compensation assessment.

29. In January of 2003, Skinner was ordered to testify in the federal trial of William Leonard Pickard, in the federal district court of Kansas, and was granted use and derivative use immunity regarding his testimony by the judge in that case. Skinner acknowledged in the trial court that his testimony in Pickard's trial was completed well before he met Brandon Green, in April of 2003.

ed by a number of "federal contacts," including the following: (1) Skinner's prior work with federal DEA (Drug Enforcement Administration) agents included introducing them to Cole, who was a key witness in the current case; (2) most of the key witnesses in this case, including the victim, had some prior contacts with the DEA;[30] and (3) Green and his father approached the DEA in late July of 2003, regarding Skinner's crimes against Green (hoping for a federal kidnapping prosecution and the potentially higher penalties that might result). In essence, Skinner maintains that any witness with *any* links to the DEA, including the victim, could not be used as a witness against him and also that even the prosecutor in this case was irreparably tainted due to contact with federal DEA agents.[31]

¶ 20 Skinner is claiming "*Kastigar*" immunity," based upon the Supreme Court's decision in *Kastigar v. United States*.[32] In *Kastigar*, the Supreme Court held that the government may compel testimony from an unwilling witness, who invokes the Fifth Amendment privilege against compulsory self-incrimination, by conferring upon that witness immunity from "use" of the compelled testimony, as well as immunity from the use of evidence "derived from" that compelled testimony, in any subsequent related criminal case against that witness ("use and derivative use immunity").[33] Within its

holding the Court noted that "such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege."[34] The Court further noted, "While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader."[35] Hence the Court rejected the claim that a witness whose testimony was compelled was entitled to "transactional immunity," which would prohibit prosecution of that witness for any offenses related to the testimony given.[36]

¶ 21 Not surprisingly, Skinner emphasizes the heavy burden imposed by *Kastigar* on the government, in a later, related prosecution of a witness whose earlier testimony was compelled and immunized, to show that the evidence used against that witness is not based upon or in any manner derived from the compelled testimony. In such cases the prosecuting authority has "the affirmative duty to prove that [all of] the evidence it proposes to use is derived from a legitimate source *wholly independent* of the compelled testimony."[37] Even in *Kastigar*, however, the Court implicitly recognized that in order for this broad immunity to apply, there had to be some kind of causal link between the compelled testimony and the subsequent

---

**30.** In particular, Green and Cole apparently went to the DEA within a month prior to the current crimes, hoping that the DEA could pursue some kind of drug action against Skinner, because they were afraid of him and wanted to get him in trouble.

**31.** Within his brief Skinner makes a number of facially ridiculous claims, including the following: "The State of Oklahoma's case is entirely derived from information gathered as a result of the immunity agreement with Mr. Skinner." Rather than focus upon these overstatements or even on the precise nature of the contacts that certain State witnesses may have had with the DEA, this Court carefully focuses on the extent and meaning of *"Kastigar* immunity" and how that immunity should be understood in the current context.

**32.** 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

**33.** *Id.* at 453, 92 S.Ct. at 1661.

**34.** 406 U.S. at 453, 92 S.Ct. at 1661.

**35.** *Id.*

**36.** The Supreme Court noted:

Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege. The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being "forced to give testimony leading to the infliction of 'penalties affixed to ... criminal acts.'"

*Id.* (internal citations omitted).

**37.** *Id.* at 460, 92 S.Ct. at 1665 (emphasis added); *id.* at 461–62, 92 S.Ct. at 1665 (government's burden to prove, in such cases, "that all of the evidence it proposes to use was derived from legitimate independent sources").

prosecution of the immunized witness.[38] The *Kastigar* Court emphasized that neither the Fifth Amendment nor the immunity statute at issue means that defendants who are compelled to testify are given a totally "free pass" in relation to their own crimes, past, present, or future.[39] Rather, such defendants are freed only from the government's use of the compelled testimony and the "fruits" of this testimony against them in a related criminal case.[40]

¶ 22 The primary question in the current case is whether *Kastigar* immunity even applies when the offense for which the immunized witness/defendant is being prosecuted (1) was committed after the giving of the immunized testimony, *and* (2) is totally unrelated to the topic(s) of the immunized testimony.[41] In *Marchetti v. United States*,[42] decided four years prior to *Kastigar*, the Supreme Court recognized that the Fifth Amendment privilege against self-incrimination could sometimes be applied to "prospective acts." [43] The *Marchetti* Court held that certain federal criminal wagering tax statutes could not be constitutionally applied to persons who defended themselves by properly asserting their Fifth Amendment privilege against self-incrimination.[44] The *Marchetti* Court emphasized that although the Fifth Amendment privilege would not typically apply to future or "prospective" acts, the question of its applicability depended not merely upon timing, but upon the extent to which the potential defendant's compelled testimony subjected him/her to the "risks of incrimination." [45] "The central standard for the privilege's application has been whether the claimant is confronted by substantial and

---

**38.** For example, the *Kastigar* Court noted that the "comprehensive safeguard" provided by the prohibition on any "use" of compelled testimony against the witness includes "barring the use of any evidence obtained by focusing investigation on a witness *as a result of his compelled disclosures.*" *Id.* at 460, 92 S.Ct. at 1664–65 (emphasis added). Consequently, this immunity would *not* bar the use of new evidence obtained against a previously immunized witness, which was discovered during a totally new investigation, which was initiated because the witness committed a new crime. Similarly, the *Kastigar* Court noted that the immunity that results from the giving of compelled testimony is meant to ensure "that the compelled testimony can in no way *lead to* the infliction of criminal penalties" against the testifying witness. *Id.* at 461, 92 S.Ct. at 1665 (emphasis added). Thus such immunity does not mean that the immunized witness is protected from the infliction of criminal penalties that have their source in a totally new crime, which inspired a totally new investigation and prosecution.

**39.** "The statute, like the Fifth Amendment, grants neither pardon nor amnesty. Both the statute and the Fifth Amendment allow the government to prosecute using evidence from legitimate independent sources." *Id.*

**40.** Although *Kastigar* itself did not specifically limit the kind of criminal cases to which the immunity would apply, later decisions recognized that the immunity was limited to prosecutions/crimes that were in some way "related" to the original immunity given. *See, e.g., United States v. Hubbell*, 530 U.S. 27, 40, 120 S.Ct. 2037, 2045, 147 L.Ed.2d 24 (2000) (summarizing *Kastigar* as deciding that for "a person who is prosecuted for matters *related to* testimony he gave under a grant of immunity," government

has affirmative duty to show that all of its evidence is derived from legitimate sources " 'wholly independent of the compelled testimony' ") (emphasis added) (quoting *Kastigar*). Similarly, the Supreme Court has held that even though the Fifth Amendment protection against self-incrimination refers to "any criminal case," it does not protect a witness from being compelled to testify where the witness's testimony could only be used against him/her in a criminal prosecution by a foreign government. *See United States v. Balsys*, 524 U.S. 666, 673–74, 118 S.Ct. 2218, 2223, 141 L.Ed.2d 575 (1998). The limitation on *Kastigar* immunity to prosecutions that are in some way related to the original testimony is discussed further *infra*.

**41.** The Oklahoma Court of Criminal Appeals has recognized and applied *Kastigar* and its principles. *See, e.g., Clem v. State*, 1985 OK CR 66, ¶¶ 19–21, 701 P.2d 770, 773–74.

**42.** 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968).

**43.** *Id.* at 53, 88 S.Ct. at 705.

**44.** *Id.* at 60, 88 S.Ct. at 709. The *Marchetti* Court emphasized that it was not questioning the government's right to tax illegal activities, *id.* at 44, 88 S.Ct. at 700, but that the federal wagering tax laws and the implementation of these laws allowed for and even encouraged the use of information obtained via *compliance* with these laws to then prosecute complying individuals for violating other federal and state laws against wagering/gambling. *Id.* at 47–48, 88 S.Ct. at 702.

**45.** *Id.* at 53–54, 88 S.Ct. at 705–06.

'real,' and not merely trifling or imaginary, hazards of incrimination." [46] Nevertheless, the *Marchetti* Court recognized that "prospective acts will doubtless ordinarily involve only speculative and insubstantial risks of incrimination...." [47]

¶ 23 In *United States v. Freed*,[48] the Supreme Court considered a claim that the amended National Firearms Act, which made it unlawful to possess or receive any firearm that had not·been properly registered in the national registry and regulated all such registrations and transfers, violated the Fifth Amendment protection against self-incrimination, on the theory that evidence of such registrations could potentially be used to prosecute persons under state laws prohibiting possession of the weapons at issue.[49] The *Freed* Court concluded that because of the prohibition against any such use of this evidence within the Act itself and the careful protection of the information gathered from compliance with the Act, the amended Firearms Act did not violate the Fifth Amendment.[50] Within its analysis the Court rejected the assertion that the furnishing of photographs and fingerprints required by the statute could potentially incriminate individuals within the prosecution of future cases.[51] The Court concluded:

> Appellee's argument assumes the existence of a periphery of the Self–Incrimination Clause which protects a person against incrimination not only against past or present transgressions but which supplies *insulation for a career of crime about to be launched.* We cannot give the Self–Incrimination Clause such an expansive interpretation.[52]

Thus the Supreme Court again recognized that the Fifth Amendment privilege ordinarily does not apply to future crimes, *i.e.,* crimes that have not yet occurred or at least begun at the time the privilege is invoked.[53]

¶ 24 In *United States v. Apfelbaum*,[54] the Supreme Court concluded that neither the Fifth Amendment nor the federal immunity statute prevented the government from using a witness's actual compelled testimony as evidence against that witness within a subsequent prosecution for making false statements within that testimony.[55] Within this decision the Court noted that it had "never held ... that the Fifth Amendment requires immunity statutes to preclude all uses of

---

**46.** *Id.* at 53, 88 S.Ct. at 705. In *Marchetti*, the Court concluded that the "hazards of incrimination" for persons complying with the federal wagering tax statutes were not "trifling or imaginary," because complying with those statutes would, in fact, "significantly enhance the likelihood of their prosecution for future acts," for violating separate laws against wagering and gambling, and would "readily provide evidence" that could be used in those future prosecutions. *Id.* at 54, 88 S.Ct. at 706.

**47.** *Id.* at 54, 88 S.Ct. at 705.

**48.** 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971).

**49.** *Id.* at 602–05, 91 S.Ct. at 1115–16.

**50.** *Id.* at 605–06, 91 S.Ct. at 1116.

**51.** The Court described this risk as being not a "substantial and real" risk, but merely a "trifling or imaginary hazard of incrimination." *Id.* at 606, 91 S.Ct. at 1116–17 (citing *Marchetti*).

**52.** *Id.* at 606–07, 91 S.Ct. at 1117 (emphasis added). Justice Brennan, concurring in the judgment in *Freed*, specifically noted that although the Fifth Amendment would protect a

transferee from any use of information obtained through compliance with the amended Firearms Act in a state prosecution for possession of the registered firearm, the Act would *not* prevent the State from using that same information in a later prosecution if the transferee committed new crimes with that firearm. *Id.* at 611, 91 S.Ct. at 1119 (Brennan, J., concurring in the judgment).

**53.** Lower courts have likewise emphasized that the privilege against self-incrimination typically applies only to past crimes or present "continuing" crimes. *See, e.g., United States v. Harvey*, 869 F.2d 1439, 1446 (11th Cir.1989) (noting that privilege generally encompasses only crimes that a witness "had already committed, or was in the process of committing, at the time of the testimony"). These courts have emphasized that because future crimes typically involve " 'only speculative and insubstantial risks of incrimination' " (quoting *Marchetti*), the exception created by *Marchetti* for certain future crimes "is a very narrow one." *Id.* at 1447.

**54.** 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980).

**55.** *Id.* at 116–17, 100 S.Ct. at 949–50.

immunized testimony." [56]  The Court also noted as follows:

> It is, therefore, analytically incorrect to equate the benefits of remaining silent as a result of invocation of the Fifth Amendment privilege with the protections conferred by the privilege—protections that may be invoked with respect to matters that pose substantial and real hazards of subjecting a witness to criminal liability *at the time he asserts the privilege*. For a grant of immunity to provide protection "coextensive" with that of the Fifth Amendment, it need not treat the witness as if he had remained silent. [57]

The *Apfelbaum* Court invoked and relied upon the analysis within the cases cited above in re-affirming that the fundamental test for the applicability of the Fifth Amendment privilege and the scope of immunity granted under this privilege is the reality and substantiality of the risks confronting the witness *at the time of* the compelled testimony or "testimonial act." [58]

¶ 25 Finally, the decision by the Third Circuit Court of Appeals, in *United States v. Quatermain,* [59] is particularly instructive in the current context. Quatermain originally negotiated an immunity deal with the federal government to testify against Fairorth about the illegal manufacture of methamphetamine. After he was convicted, Fairorth became a federal informant against Quatermain regarding the illegal manufacture of a gun silencer, which occurred over a year after Quatermain had entered into his immunity agreement. The government conceded that Fairorth's cooperation with the government was motivated, at least in part, by Quatermain's prior testimony against him. The question at issue was whether Quatermain's prosecution was prohibited by the prior immunity agreement, because Fairorth's assistance and the resulting case were "derived from" the prior case. [60]

¶ 26 The Court of Appeals considered the cases and analysis summarized above and concluded that the Fifth Amendment privilege usually applies only to past or continuous crimes, where the risk of incrimination is "substantial and real," and that its application to future conduct, as in *Marchetti,* was limited to cases where the future conduct "was part of a continuing course of similar criminal activity." [61]  The court found that "[t]he subsequent offense in this case ... was not the result of a continuous criminal enterprise and involved a different type of criminal activity." [62]  The *Quatermain* court noted that it could find no case where the Fifth Amendment privilege had been held to apply to a witness who refused to testify because his testimony could potentially incriminate him for a different type of criminal act that he might commit in the future. And because Quatermain's Fifth Amendment privilege would not have allowed him to refuse to testify about Fairoth's methamphetamine manufacture, on the ground that it might incriminate Quatermain if he decided to commit some other type of crime in the future, Quatermain's immunity did not preclude Fairorth's assistance and testimony against him in the subsequent gun silencer case. [63]

---

56.  *Id.* at 125, 100 S.Ct. at 954.

57.  *Id.* at 127, 100 S.Ct. at 955 (emphasis added).

58.  *Id.* at 124–30, 100 S.Ct. at 954–57; *see also United States v. Hubbell,* 530 U.S. 27, 40–46, 120 S.Ct. 2037, 2045–48, 147 L.Ed.2d 24 (2000) (finding that Fifth Amendment privilege and immunity given to overcome privilege include "testimonial aspect" of witness's actions in assembling and producing documents in response to subpoena, which led to grand jury indictment of witness; hence the privilege/immunity prohibit resulting prosecution of witness).

59.  613 F.2d 38 (3rd Cir.1980).

60.  *Id.* at 39–40.

61.  *Id.* at 41–42, 42.

62.  *Id.* at 42.

63.  *Id.* at 42–43.  This Court notes that although we agree with the cited legal analysis of *Quatermain,* the prosecutions at issue in that case were arguably more "related" than in the current case, particularly because Fairorth's assistance in the case against Quatermain was found to be motivated by Quatermain's prior (immunized) testimony against Fairorth. It is arguable, in *Quatermain,* in a way that it is not in the current case, that Fairorth's later cooperation with the government, in order to get back at Quatermain, was indeed a "hazard of incrimination" from Quatermain's earlier immunized testimony. Therefore, even though we agree with *Quater-*

¶ 27 This Court concludes that *Kastigar* immunity has no application to a prosecution for offenses that are alleged to have been committed by the immunized witness entirely *after* the grant of immunity, when the alleged offenses are also *totally unrelated* to the topic(s) of the immunized testimony. Consequently, this Court concludes that Skinner's prior immunity agreements with the federal government did not in any way prohibit or limit the State of Oklahoma's ability to investigate and prosecute him for his violent and sadistic actions against Brandon Green in July of 2003.[64] Skinner did not even *know* Green at the time of his immunity agreements and his federal testimony. And the topics of Skinner's immunity agreements and testimony, *i.e.*, the illegal drug activities and money laundering of persons with whom Skinner was then associated, had absolutely nothing to do with his later decision to kidnap, maim, and torture Brandon Green. The risk that Skinner's assistance and testimony could somehow incriminate him—in the event that he *later* chose to kidnap, maim, and torture someone he had not yet met—was certainly "trifling" and "imaginary," rather than being "substantial" and "real," in the year 2000 and even in early 2003. Even if Skinner was already daydreaming about someday kidnapping, maiming, and torturing some future victim during these earlier time periods, the Fifth Amendment and his immunity agreements offered Skinner no protection for such a "career of crime about to be launched."

¶ 28 The Fifth Amendment and the immunity provided for compelled testimony serve as a shield to protect individuals against any reasonably foreseeable use of their own testimony against them in a criminal case. Skinner completely misunderstands the scope of the Fifth Amendment

privilege against self-incrimination and the immunity based upon this privilege. Rather than a shield, Skinner attempts to convert these protections into a sword, which can be used to commit new crimes against new victims, and for which he would then be effectively untouchable. None of the authorities relied upon by Skinner support his open-ended interpretation of *Kastigar* immunity. *Kastigar* is about immunity from being prosecuted for past or continuing crimes through the use of one's own compelled testimony or evidence developed from that testimony. It is *not* about impunity to go out and commit brand new crimes, on the belief that no government will be able to prosecute a former cooperating witness who is toting an immunity agreement in his back pocket.

¶ 29 Because the crimes that Skinner was charged with committing in the current case were, without question, committed entirely after his grants of immunity and were also totally unrelated to his prior assistance and testimony, *Kastigar* immunity is simply not at issue in the current case. Thus the district court was not required to hold the extensive *Kastigar* hearings that it held, in which Skinner attempted to show that witnesses and evidence in the current case, and even the prosecutor himself, were somehow irreparably "tainted" by the prior federal case. This Court appreciates the efforts and patience of the district court and its commitment to ensuring that Skinner's rights were not violated, which was demonstrated by allowing defense counsel to pre-examine every single State witness, in an attempt to show that the current prosecution was tainted by the prior federal case. Hopefully the analysis herein will help avoid this kind of wasted time and effort in the future, in cases where, despite a witness's earlier Fifth Amendment-

---

main's legal analysis, as cited in the text, this Court would not necessarily decide this case the same way.

64. This Court notes that the actual terms of Skinner's immunity agreements with the federal government could be broader than is required by the Constitution and constitutionally-based decisions such as *Kastigar*. Hence it is entirely possible that the *federal* government, which made the immunity agreements with Skinner, could be subject to more extensive prohibitions on "any"

use of information obtained under those agreements in connection with "any" criminal case, as a matter of contract law. Because the State of Oklahoma was not a party to these agreements, however, the State of Oklahoma is not bound by those actual agreements, though it is bound to respect Skinner's Fifth Amendment privilege and any immunity based upon this privilege. The current opinion is based upon these constitutional principles, not contract law principles.

based immunity, the circumstances clearly reveal that the proscriptions of *Kastigar* simply do not apply.

¶ 30 This Court notes that there was no attempt to use any of Skinner's actual immunized testimony against him in the current case. This Court need not and does not decide whether actual immunized testimony can ever be used against an immunized witness in a subsequent and entirely unrelated criminal case, prosecuted by a different sovereign.[65] We do find that in a later and totally unrelated case, the prosecuting authority is *not* obligated to prove that all of its evidence was derived from new and "wholly independent" sources.

¶ 31 The perils and pitfalls of an unlimited interpretation of *Kastigar* immunity are readily apparent in the current case. Skinner and his attorneys have taken the remarkable position, from the inception of the current case, that Skinner simply cannot be prosecuted for his violent actions against Brandon Green, because of his prior immunity agreement with the federal government. We have already explained, based upon *Kastigar* and its progeny, why this position is legally flawed. In addition, this Court notes that the extensive *Kastigar* hearings held in this case revealed only isolated and incidental connections between the current prosecution and the prior federal case. Most significantly, perhaps, it appears that a DEA agent helped put the Tulsa police department in contact with "Mike the truck-driver"—allegedly based upon information that the DEA had from prior dealings with Skinner—since Green did not know Mike Hauck's last name at the time. Although even this kind of assistance would be precluded if the current case had developed from Skinner's earlier testimony, this case obviously had an entirely separate source: Skinner's subsequent and totally unrelated crimes.

¶ 32 Similarly, it does not matter that Krystle Cole, Mike Hauck, and Brandon Green were known to the DEA and had some interactions with the DEA prior to the current prosecution and even the current crimes, even if it was Skinner who first brought Cole into contact with the DEA.[66] Nor was the DEA or the federal government prevented from passing on, to the State of Oklahoma, the information provided to federal agents in late July of 2003 and thereafter, when Green and his father sought federal assistance regarding Skinner's crimes against Green. Because the real and substantial risks of incrimination that confronted Skinner at the time of his 2000 federal immunity deal and his 2003 federal immunity deal/testimony did *not* include the remote and insignificant possibility that his assistance could someday provide information or leads that would be helpful to the State of Oklahoma in prosecuting Skinner for some future violent attack, on a victim that Skinner had not then even met, the sweeping protections of *Kastigar* simply do not apply in the current case. Skinner's Proposition I claim is rejected accordingly.

¶ 33 In Proposition II, Skinner asserts that he is entitled to a new trial due to the discovery of new evidence that had not been previously disclosed.[67] The argument in Skinner's brief, however, merely gestures at a true *Brady* claim and a "newly discovered evidence" claim, without coming close to fully developing either.[68] This Court concludes, accordingly, that Skinner's Proposition II claim has been waived.[69]

65. *But see Apfelbaum*, 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980) (discussed *supra*).

66. Nor does it matter that Green and Cole approached the DEA about Skinner's drug activities in the month prior to Skinner kidnapping and torturing Green, particularly since none of this information (or any information derived therefrom) played any role in the current prosecution.

67. On August 18, 2008, Skinner tendered a "Motion to Supplement the Record" with evidence

relating to this claim. For the reasons discussed herein, this motion is **DENIED**.

68. *See* Rules 3.5 and 3.11(B), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2008); *see also Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

69. The "non-disclosed" information that Skinner cites comes from the presentence investigation report in Krystle Cole's case. Cole pled "no contest" in her case almost five months after Skinner's trial was completed, and the cited re-

¶ 34 In Proposition III, Skinner again gestures at, but does not fully make, a claim under the Interstate Agreement on Detainers Act ("IADA").[70] Consequently, this Court finds that this claim has likewise been waived.[71] This Court notes that the State's brief accurately catalogs the various continuances granted in this case—mostly at Skinner's request and with his explicit waiver of the IADA's 120–day rule. Skinner has totally failed to demonstrate that the timing of his trial violated the IADA.[72] This claim is rejected accordingly.

■ ¶ 35 In Proposition IV, Skinner challenges a number of remarks made by the prosecutor in this case and alleges that they effectively "denied Mr. Skinner a fair trial." Yet again, however, Skinner fails provide a complete argument in this section and totally fails to show how his trial was rendered unfair by the referenced remarks.[73] Hence this claim too has been waived and is rejected accordingly.

port was filed more than four months after that plea. In addition, the supposedly "exculpatory" information contained therein relates to the extent of Cole's involvement in Green's ordeal. In relation to Skinner, the cited material is insignificant, irrelevant, and unclear. It certainly would not have made any difference in Skinner's trial.

70. See 22 O.S.2001, § 1347 ("Interstate Agreement on Detainers").

71. See Rule 3.5, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2008).

72. See 22 O.S.2001, § 1347 (Article IV(c)) (noting that "for good cause shown in open court," trial court may grant "any necessary or reasonable continuance," without violating IADA's 120–day rule). Skinner has totally failed to allege or establish that the continuances granted in his case were for something other than "good cause."

73. This Court notes that Skinner's primary challenge is to the prosecutor's reference to Skinner, during opening statements, as someone "who manufactures [hallucinogenic] drugs," which was objected to by defense counsel. At a sidebar following this objection, the trial court asked defense counsel if he wanted the jury specifically admonished that the "manufacturing of drugs" was not an issue in the case and should not be

■ ¶ 36 In Proposition V, Skinner challenges the trial court's response to the following jury note, sent out during the jury's second-stage sentencing deliberations: "Will sentences be concurrent or consecutive? Will we or judge make that decision?" After discussing the jury note and possible responses with the parties, the trial court sent the jury the following response: "You have all the law and evidence needed to decide this case."

¶ 37 Skinner argues herein that the jury should have been instructed that the trial court would be the one to determine whether Skinner's sentences would be served concurrently or consecutively.[74] However, Skinner did not request such an instruction at trial, thereby waiving this claim absent plain error.[75] This Court has found that the response given by the trial court in this case is the proper response to a jury question about how a particular defendant's sentences will be served (consecutively or concurrently) or who makes this determination.[76] Thus the trial court's response herein could not have

considered. Defense counsel chose to have this admonishment given, which was then done. The issue was not raised again. This single, isolated comment certainly did not render Skinner's trial unfair. Regarding Skinner's claim about arguing "facts that were not in evidence," it is not even clear what particular factual assertion Skinner is challenging. And there is nothing unfairly prejudicial in the material quoted.

74. In fact, Skinner offers the following as a proper response/instruction: "You, the jury, are to determine what range of punishment is appropriate for each conviction. I, the judge, determine whether the sentences should be served concurrently or consecutively. You must not let that fact influence your decision in any way."

75. Instead, Skinner argued at trial that the jury should be instructed about whether Skinner's sentences would, in fact, be served concurrently or consecutively. Not surprisingly, the trial court insisted that this question could not then be answered, since the court would make that decision based upon information that was not yet available, such as the sentences given by the jury.

76. See, e.g., *Trice v. State*, 1993 OK CR 19, ¶ 52, 853 P.2d 203, 218 ("When a deliberating jury seeks information concerning its power to run sentences consecutively, the trial judge should respond by stating that all the information need-

been plain error.[77]

■ ¶ 38 In Proposition VI, Skinner argues that the former felony conviction used to enhance his sentences in the current case, a 1991 New Jersey conviction for third degree Conspiracy to Distribute CDS, could not be used for this purpose, because the completion of his sentence for this prior conviction was not within ten years of the commission of the crimes in this case.[78] This claim was properly raised in the trial court. The trial court rejected this claim, finding: (1) that the completion of the sentence for the New Jersey conviction was within ten years of the crimes in the current case, and (2) that even if this New Jersey conviction was not already within the ten-year enhancement window, an intervening federal misdemeanor conviction would serve to bring the New Jersey conviction within this window.

¶ 39 The New Jersey conviction relied upon by the State to enhance Skinner's sentences herein is dated June 13, 1991. The judgment sentences "Gordon Todd Skinner" to a term of "three (3) years probation," with "credit for time served of 331 days." Hence this sentence was fully discharged on July 17, 1993. The crimes in the current case began no later than July 4, 2003 and were completed no later than July 11, 2003. Although these crimes were committed close to the end of the ten-year enhancement window, they were clearly within this window. Thus it was entirely appropriate to use the New Jersey felony conviction to enhance Skinner's current convictions. This claim is rejected accordingly.[79]

■ ¶ 40 Within Proposition VI, Skinner also raises an alternative claim that the State failed to adequately establish that the person convicted in the New Jersey case is indeed the same "Gordon Todd Skinner" who has been charged and convicted in the current case.[80] Skinner never raised any claim in the trial court questioning the State's assertion that the man convicted in the New Jersey case was indeed him. Consequently, and because the name of conviction in the New Jersey case is, in fact, the defendant's actual name and the same name by which he is charged in the current case, "Gordon Todd Skinner," this Court rejects the current claim.[81] We note that the New Jersey conviction lists 7/13/64 as the defendant's date of birth in that case, which the record in this case reveals is Skinner's correct birthday.[82] Nothing in the record suggests that the man convicted in the 1991 New Jersey case was anyone other than the defendant in this case. And this claim is rejected accordingly.

¶ 41 In Proposition VII, Skinner challenges the trial court's refusal to instruct the jury regarding the meaning of a "life" sentence, as he requested at trial. Skinner relies upon

ed to make the decision is contained in the instructions.").

77. Within his Proposition V claim, Skinner notes that his jury sent a further note stating: "Define a life sentence in a number of years. (Please!) For Example: 100 years?" Defense counsel did not object to the trial court's response to this question: "You have all the law needed to decide this case." Skinner now argues that this further question illustrates "proof of the error regarding the first question." It certainly does not.

78. See 21 O.S.Supp.2003, § 51.1 (general enhancement statute); 21 O.S.Supp.2003, § 51.2 ("Except as provided in [21 O.S.Supp.2002, § 51.1a], no person shall be sentenced ... under Section 51.1 of this title ... when a period of ten (10) years has elapsed since the completion of the sentence imposed on the former conviction; provided, said person has not, in the meantime, been convicted of a misdemeanor involving moral turpitude or a felony.").

79. This Court need not reach the issue of whether Skinner's intervening federal misdemeanor conviction involves "moral turpitude," although the record suggests that it does.

80. The New Jersey conviction of Gordon Todd Skinner lists the following two names as aliases: Terrance Finnegan and Dwayne Miller.

81. See Cooper v. State, 1991 OK CR 54, ¶ 8, 810 P.2d 1303, 1306 ("[T]he identity of name of the defendant and the person previously convicted is prima facie evidence of identity of person, and in the absence of rebutting testimony, supports a finding of such identity." (quoting Williams v. State, 1961 OK CR 70, ¶ 7, 364 P.2d 702, 704)).

82. In addition, we note that during sentencing-stage closing arguments, on June 20, 2006, Skinner's own counsel described him to the jury as "a 42–year–old man." Skinner turned 42 years old less than a month after this comment was made.

this Court's decision in *Anderson v. State.*[83] Yet Anderson involved the "85% Rule," under which persons convicted of crimes enumerated in 21 O.S., § 13.1 are required to serve at least 85% of their sentences before they can even be considered for parole.[84] Perhaps surprisingly, none of the crimes in the current case are (or were) "85% crimes." [85] Hence Anderson does not apply herein, and Skinner's jury was not entitled to any instruction on how a "life" sentence in his case would be served.[86] Skinner has neglected to suggest, both in the trial court and here on appeal, how the desired instruction, defining the meaning of a "life" sentence in this non–85%–Rule case, would even be worded. This Court rejects Skinner's claim accordingly.

 ¶ 42 After thoroughly considering the entire record before us on appeal, including the original record, transcripts, briefs, and exhibits of the parties, we find that neither reversal nor modification of Skinner's convictions and sentences is required by the law and evidence. We further find, however, that the Judgment and Sentence documents in this case should be modified, through orders *nunc pro tunc* by the district court, to clearly state that each of Skinner's three convictions was found by the jury to be "After Former Conviction of a Felony" (AFCF), for which Skinner was sentenced accordingly.

### Decision

¶ 43 Skinner's convictions for Conspiracy to Commit Kidnapping AFCF, Kidnapping AFCF, and Assault and Battery with a Dangerous Weapon AFCF, as well as his sentences on these three counts, are **AFFIRMED**. This case is **REMANDED**, however, for clarification of the Judgment and Sentence documents, through orders *nunc pro tunc* by the district court, in accordance with this opinion. Pursuant to

83. 2006 OK CR 6, 130 P.3d 273.

84. *See id.* at ¶¶ 10–25, 130 P.3d at 277–83; see also 21 O.S., §§ 12.1 and 13.1 (establishing the "85% Rule").

85. *See* 21 O.S.Supp.2002, § 13.1 (listing 85% crimes at time of Skinner's offense); *see also* 21 O.S.Supp.2008, § 13.1 (listing current 85% crimes).

Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2009), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.[87]

C. JOHNSON, P.J., A. JOHNSON, V.P.J. and LEWIS, J.: concur.

LUMPKIN, J.: concur in results.

86. *See Lacy v. State,* 2007 OK CR 20, ¶ 7, 171 P.3d 911, 914 (defendant not entitled to 85% Rule instruction in case not involving 85% Rule crime).

87. As noted *supra*, Skinner's Motion to Supplement the Record, tendered for filing on August 18, 2008, is hereby **DENIED**.