RUNNELS v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:RUNNELS v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 RUNNELS v. STATE
2018 OK CR 27
Case Number: F-2017-136
Decided: 08/09/2018
MARCUS HILLAND RUNNELS, Appellant v. THE STATE OF OKLAHOMA, Appellee.
Cite as: 2018 OK CR 27, __ __

 

 

OPINION

LUMPKIN, PRESIDING JUDGE:

¶1 Appellant, Marcus Hilland Runnels, was tried by jury and convicted of First Degree Murder (Count 1) (21 O.S.Supp.2012, § 701.7) and Assault with a Dangerous Weapon (Count 2) (21 O.S.2011, § 645) After Former Felony Conviction in District Court of Tulsa County Case Number CF-2015-6742.[1] The jury recommended as punishment imprisonment for life without the possibility of parole and a $10,000.00 fine in Count 1 and imprisonment for ten (10) years and a $5,000.00 fine in Count 2. The trial court sentenced accordingly, suspended payment of the fines, and imposed a $50.00 Victims Compensation Assessment and court costs in each count. The trial court ordered the sentences to run concurrently and granted Appellant credit for time served.[2] It is from these judgments and sentences that Appellant appeals.

FACTS

¶2 Thomas Bryan resided with his wife, Lori Mangels, at 1328 North Birmingham Place in Tulsa, Oklahoma. Appellant lived with his mother in a nearby home. Appellant's grandmother resided near Bryan's home too. Mangels knew Appellant through a mutual acquaintance. Bryan knew Appellant and his green Saturn from his travels through the neighborhood.

¶3 On December 15, 2015, Bryan was helping his friend, Leland Mitchell, move into Bryan's home. The two men were in Bryan's front yard shortly after school let out that day. Bryan observed Appellant speed down the street in an unsafe manner while school children were walking nearby. Bryan hollered at Appellant to slow down but Appellant just kept going.

¶4 Mitchell and Bryan left to get another load of Mitchell's belongings. Mitchell drove Bryan's truck. Bryan followed on his motorcycle. On the way, Bryan observed Appellant's green sedan stopped on the street. Bryan approached the car and cussed Appellant. He exclaimed: "What the hell is wrong with you? You're gonna run over somebody and kill someone, you know? I realize you got two kids in your car, how would you like for them to get runned over."[3] Appellant responded by asking Bryan where his wife was at? Bryan drove off towards Mitchell's house. Appellant dropped his children off at his grandmother's house but allowed his younger brother to remain in the car. He chased after Bryan with his 12 gauge pump-action shotgun. Bryan noticed Appellant behind him just as Appellant fired two shots from his moving car. Bryan ran a stop sign and got away from Appellant.

¶5 Appellant visited Bryan's home while Bryan was at Mitchell's house. Lori Mangels was home and heard him honking. When she went to the front door, Appellant called to Mangels and told her that he needed to tell her something. Appellant beckoned Mangels to come to his car. When Mangels complied, Appellant asked her if she had heard those shots? Mangel asked, what shots? Appellant stated: "I took two shots at Thomas."[4] Appellant showed Mangels his shotgun. He explained that Bryan had called him the N-word while cussing him for speeding through the neighborhood. Appellant threatened that if he ever saw Bryan again he would blow Bryan's head off. This upset Mangels. After Appellant left, she phoned Bryan and told him what Appellant had threatened.

¶6 In response to Mangels' call, Bryan and Mitchell returned to Bryan's home. Everything was quiet for a few hours but Bryan soon observed Appellant's Saturn out front of his home on the security cameras he had installed on the front of his house. Appellant sat in the car for few minutes and then drove off. After Appellant drove by a second time, Bryan and Mitchell went out on the front porch. From approximately two blocks away, Appellant fired two shots while still seated in his car.

¶7 Bryan did not have a firearm inside his home. He only had a pellet gun and a BB gun. Hoping to scare Appellant, Bryan shone a red laser pointer from his flashlight at Appellant's car. In the darkness, the laser shone very well. Bryan also held the pellet handgun. Appellant was undeterred by Bryan's actions. He started to circle the block around to Bryan's home again. Concerned that Appellant would shoot at his house, Bryan had Mangel hide inside the back part of the home. Bryan ran and hid between his house and his neighbor's home.

¶8 Against Bryan's advice, Mitchell went to his Grand Am to move it so that it would not get shot up. He drove the vehicle in reverse out of Bryan's driveway and into the street. Appellant fired two shots at Mitchell from the street one-half of a block south of Bryan's home. One of the slugs struck Mitchell in the head, killing him. After Appellant drove off, Bryan found Mitchell in the still-running car with a golf ball size hole in his forehead.

¶9 Dr. David Arboe of the State Medical Examiner's Office performed an autopsy on Mitchell's body. Arboe found that the slug had entered Mitchell's left forehead area, damaged several structures and exited the right posterior head. This wound caused Mitchell's death.

¶10 The Tulsa Police Department responded to Mangel's 911 call. They recovered the slug from the back window shelf of Mitchell's car. Officer Alisa Parrott located two pieces of shotgun wadding one-half block away from Bryan's home at the corner of Birmingham Place and Newton Place. Bryan identified Appellant as the shooter to the investigating officers. Officer Adam Dawson went to the home of Appellant's grandmother but Appellant was not there.

¶11 Sergeant David Walker found Appellant's green Saturn on the side of the road half way between Bryan's house and the home of Appellant's mother. Officer Vic Regalado responded to Appellant's residence with several other officers. When the officers approached the house, the interior lights and Christmas tree lights were turned off. No one answered the door. The officers maintained a perimeter around the home. Appellant surrendered to the SWAT Team approximately two hours later, after a police negotiator was able to persuade both Appellant and his family to exit the home.

¶12 Sergeant Walker helped execute a Search Warrant on Appellant's residence. He discovered a set of Saturn keys hidden under a mattress in one of the bedrooms. Walker further found a Western Field brand pump action shotgun in the closet of the master bedroom. Detective Kyle Ohrynowicz also helped search the home. He discovered a shotgun shell in the floor of the master bedroom. Ohrynowicz also found a box of Winchester brand 12 gauge shotgun shells in a drawer in the home. The shells were one ounce slug rounds.

¶13 Detective Richard Aschoff executed a Search Warrant on Appellant's Saturn. He found a spent Winchester brand shotgun shell pinched in the hinge between the door and the body of the vehicle. Aschoff also discovered a couple of live shotgun shells in the car. Both of the shells were slug rounds.

¶14 Forensic Firearm Examiner, Joy Patterson, compared the spent shotgun shell recovered from the Saturn with the shotgun found in Appellant's residence. Patterson determined that the shell had been fired from the weapon.

¶15 Detective Justin Ritter interviewed Appellant the next morning. After waiving his rights under Miranda,[5] Appellant immediately asked: "What am I in here for?"[6] Appellant admitted driving the green Saturn but wholly denied any knowledge of a confrontation with Bryan. He denied speeding that day and disallowed that a guy on a motorcycle had come up to him complaining about his driving. After Ritter confronted Appellant with the fact that his fifteen year old brother had confirmed that the confrontation had occurred, Appellant finally acknowledged that Bryan had confronted him. He complained that Bryan had called him the N-word but related that he had gone back to his home and played video games afterward. Appellant denied shooting at Bryan while he was riding the motorcycle. He asserted that he did not have a shotgun. Appellant admitted that he spoke to Lori Mangels but claimed that he had told her that everything was cool. He related "I guess the dude got shot . . . people calling me already."[7]

¶16 When Ritter advised Appellant that they had found the shotgun in his house, the wadding on the street corner, and the slug in Mitchell's car, Appellant admitted to possessing the shotgun and firing it that day. He claimed that a few hours after the confrontation Bryan had pointed the laser pointer at him and fired a handgun at both him and his little brother. Appellant asserted that he had fired the shotgun one time into the air and then went back home. He was very adamant that he only fired the shotgun one time that day. Appellant related that he was familiar with the weapon and indicated that he practiced with the shotgun regularly at his family's farm.

 

¶17 Ritter accused Appellant of lying and advised him that Mitchell had died after being shot in the head. Ritter indicated that the officers intended to compare the slug recovered from Mitchell's car and compare it to Appellant's shotgun. Appellant feigned crying and exclaimed, "I don't know if I shot that dude man. If it did happen I didn't mean for that to happen." No sooner than he began crying, Appellant stopped. He confessed that when the car backed out of Bryan's driveway, he had fired two shots down the street at it. Appellant admitted that prior to the shooting he was safe at home. He could not explain why he went back to Bryan's house and lamented that his friend had told him to leave it alone. Appellant admitted that initially he had "lied" to Ritter but asserted that he was just trying to scare Bryan.

DISCUSSION

¶18 In his first proposition of error, Appellant challenges the trial court's instruction on transferred intent. He concedes that he waived appellate review of this claim for all but plain error when he failed to raise this challenge at the time of trial. Stewart v. State, 2016 OK CR 9, ¶ 25, 372 P.3d 508, 514. Therefore, we review Appellant's claim pursuant to the test set forth in Simpson v. State, 1994 OK CR 40, 876 P.2d 690. Id. Under this test, an appellant must show an actual error, which is plain or obvious, and which affects his substantial rights. Id. This Court will only correct plain error if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings or otherwise represents a miscarriage of justice. Id.

¶19 Appellant argues that the trial court erred when it failed to choose "kill" from the list of options in the uniform jury instruction for transferred Intent. Reviewing the record, we find that Appellant has shown an error that is plain or obvious. Instructions are sufficient where they accurately state the applicable law. Reed v. State, 2016 OK CR 10, ¶ 15, 373 P.3d 118, 122.

¶20 The doctrine of transferred intent is firmly rooted in Oklahoma case law. Jackson v. State, 2016 OK CR 5, ¶ 8, 371 P.3d 1120, 1122; Short v. State, 1999 OK CR 15, ¶ 44, 980 P.2d 1081, 1098. The uniform instruction concerning transferred intent provides:

If you find that the defendant intended to kill/injure/assault [Name of Intended Victim], and by mistake or accident injured/assaulted [Name of Actual Victim], the element of intent is satisfied even though the defendant did not intend to kill/injure/assault [Name of Actual Victim]. In such a case, the law regards the intent as transferred from the original intended victim to the actual victim.

Instruction Number 4-11, OUJI-CR(2d)(Supp.1997). We note that the bolded language within the instruction is intended to signal to the trial court that the instruction must be modified before given to the jury. The slash symbol is intended to cause the trial court to elect the alternative(s) which most accurately fits the case at trial. Because the transferred intent doctrine directly relates to the relevant mens rea element of the charged offense, the trial court should have chosen "kill" from the alternatives of "kill/injure/assault." See Jackson, 2016 OK CR 5, ¶¶ 6, 9, 371 P.3d at 1122-23; 21 O.S.Supp.2012, § 701.7(A) (setting forth mens rea element of malice murder as a deliberate intention to unlawfully take away the life of another human being).

¶21 Instead, the trial court instructed the jury as follows:

If you find that the defendant intended to kill/injure/assault THOMAS BRYAN, and by mistake or accident killed LELAND MITCHELL, the element of intent is satisfied even though the defendant did not intend to kill LELAND MITCHELL. In such a case, the law regards the intent as transferred from the original intended victim to the actual victim.

Since this instruction permitted the jury to find that Appellant had the intent to kill Mitchell based upon a pre-existing intent to injure or assault Bryan the instruction failed to accurately set forth the Rule of Law concerning transferred intent.

¶22 However, we find that Appellant has not shown that this error affected his substantial rights. A "substantial right" is a matter of substance as distinguished from a matter of mere form. Simpson, 1994 OK CR 40, ¶ 10, 876 P.2d at 694. Errors that affect substantial rights are those "'which go to the foundation of the case, or which take from a defendant a right which was essential to his defense.'" Id., 1994 OK CR 40, ¶ 12, 876 P.2d at 695, quoting Rea v. State, 1909 OK CR 160, 105 P. 386. This is simply not a case where the doctrine of transferred intent applies.

Under the doctrine of transferred intent when one person acts with intent to harm another person, but because of a bad aim he instead harms a third person who he did not intend to harm, the law considers him just as guilty as if he had actually harmed the intended victim.

Short, 1999 OK CR 15, ¶ 44, 980 P.2d at 1098 citing W. LaFave and A. Scott, Criminal Law, § 3.12(d) (2nd ed.1986). There was not any evidence at trial that Appellant had aimed the shotgun at Bryan but missed and instead killed Mitchell. Instead, the evidence suggested that Appellant suffered a mistake of fact as to the victim's identity. See 21 O.S.2011, § 152 (5) (setting forth the defense of mistake of fact disproving criminal intent). The transferred intent or unintended victim doctrine is to be distinguished from the mistaken identity situation. 1 Wayne R. LaFave, Substantive Criminal Law, § 6.4(d) (3d ed.) (Westlaw 2017).

The situation [ ] concerning the unintended victim of an intentional crime-which we have referred to for short as the bad-aim situation-is to be distinguished from an entirely different unintended-victim case-the mistaken-identity situation-which is governed by a quite separate set of legal rules. Thus in the semi-darkness A shoots, with intent to kill, at a vague form he supposes to be his enemy B but who is actually another person C; his well-aimed bullet kills C. Here too A is guilty of murdering C, to the same extent he would have been guilty of murdering B had he made no mistake. A intended to kill the person at whom he aimed, so there is even less difficulty in holding him guilty than in the bad-aim situation. And of course A's conceivable argument that his mistake of fact (as to the victim's identity) somehow negatives his guilt of murder would be unavailing: his mistake does not negative his intent to kill; and on the facts as he supposes them to be A is just as guilty of murder as he is on the facts which actually exist.

Id., (footnotes omitted). 1 Wayne R. LaFave, Substantive Criminal Law § 6.4(d), at 48 (2d ed.2003).

¶23 Although Appellant may have believed that Bryan was behind the wheel of the Grand Am, all of the evidence at trial suggested that he intended to kill the driver of the vehicle. Appellant admitted that he knew his weapon well and practiced with it regularly. The evolving string of lies which he told Detective Ritter further evinced Appellant's intent to kill the driver of the Grand Am. Therefore, the error in the instruction did not affect Appellant's substantial rights and we conclude that plain error did not occur.

¶24 Even if we were to find that the challenged instruction constituted plain error, we would find that this error was harmless. Turrentine v. State, 1998 OK CR 33, ¶ 21, 965 P.2d 955, 967 (finding that erroneous instruction on transferred intent subject to harmless error analysis). Appellant has not shown that the error seriously affected the fairness, integrity or public reputation of the judicial proceedings or otherwise represented a miscarriage of justice. The trial court properly instructed the jury concerning the requisite elements of first degree malice murder. See Instruction Number 4-61, OUJI-CR(2d) (Supp.1997). The State proved beyond a reasonable doubt that Appellant had intended to kill Thomas Bryan. As opposed to the multitudes of cases which come before this Court without any direct evidence of intent, the record in the present contains Appellant's explicit expression of his intent to take Bryan's life. Lori Mangels testified that Appellant showed her his shotgun and threatened to blow Bryan's head off the next time that he saw him. Appellant's actions thereafter wholly conformed to this stated intent when he shot Mitchell. Based upon the overwhelming evidence of Appellant's guilt we find that the error in the instruction was harmless beyond a reasonable doubt. See Burgess v. State, 2010 OK CR 25, ¶ 21, 243 P.3d 461, 465 (finding error which relieved State of burden of proving all of the essential elements of the offense harmless beyond a reasonable doubt). Proposition One is denied.

¶25 In his second proposition of error, Appellant contends that prosecutorial misconduct deprived him of a fair trial. This Court's review is well established. "Prosecutorial comments, like jury instructions, are not reviewed in artificial isolation, but must be judged in the context of the entire record. Allegations of prosecutorial misconduct do not warrant reversal of a conviction unless the cumulative effect was such as to deprive the defendant of a fair trial." Ashton v. State, 2017 OK CR 15, ¶ 38, 400 P.3d 887, 897 (quotations and citations omitted).

¶26 Appellant concedes that he failed to object to the prosecutor's comments at trial. Therefore, we find that he has waived appellate review of his claims for all but plain error and review them pursuant to the test set forth in Simpson to determine whether Appellant has shown an actual error, which is plain or obvious, and which affected his substantial rights. Malone v State, 2013 OK CR 1, ¶ 41, 293 P.3d 198, 211-212. This Court will only correct plain error if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings or otherwise represents a miscarriage of justice. Id.

¶27 Reviewing the record, we find that Appellant has not shown the existence of an actual error. Appellant asserts that the prosecutor made a misstatement of law during closing argument. This Court has clearly explained that prosecutors should not misstate the law to the jury. Ashton, 2017 OK CR 15, ¶ 52, 400 P.3d at 900. The record shows that the prosecutor informed the jury in the present case that:

Life with the possibility of parole means 45 years. Forty-Five years is the determination because the State determined many years ago that somebody sentenced to life has the right to ask for parole at some point, so they had to attach a number to it. Life in the State of Oklahoma means 45, which means that you are eligible for consideration of parole after 38 years and three months.

Appellant argues that the prosecutor's comments violated the rule announced in Florez v. State, 2010 OK CR 21, 239 P.3d 156, and Taylor v. State, 2011 OK CR 8, 248 P.3d 362.

¶28 In Florez, this Court held that a prosecutor's description of the 85% Rule was a misstatement of law. Florez, 2010 OK CR 21, ¶¶ 5-6, 239 P.3d at 158. The prosecutor, in Florez, argued:

And you're also given an instruction that tells you he will only do 85 percent of what you give him. He's not going to do all of it. So you've got to take that into consideration. He's only going to do 85 percent of it.

Id., 2010 OK CR 21, ¶ 5, 239 P.3d at 158. We found that this constituted a misstatement of law because nothing in either 21 O.S.Supp.2007, § 13.1 or the standard criminal jury instruction supported the inference that the defendant would be freed before he served the full term of any sentence imposed. Id., 2010 OK CR 21, ¶ 6, 239 P.3d at 158. The correct statement of law would have been that the defendant "would have to serve 85% of his sentence before becoming eligible for parole." Id., 2010 OK CR 21, ¶ 7, 239 P.3d at 158.

¶29 In Taylor, this Court found that the prosecutor had likewise misstated the law during closing argument when he argued:

It's probably not a shocker to you people that you don't serve your entire sentence. These instructions lay out for you the ground rules. 85 percent of life, which is equated to 45 years. The Department of Corrections decided 45 years is what a life sentence is. You serve 85 percent of that, which comes out to thirty eight years and three months or something. It's in here and it explains to you how that works. Both of these crimes are considered, under the law, to be 85 percent instructions and that's Instruction 31 and 33.

Taylor, 2011 OK CR 8, ¶ 48, 248 P.3d at 377. We found that the prosecutor's assertion that a criminal defendant does not serve his entire sentence but only serves thirty eight years and three months was contrary to the statutory reality. Id., 2011 OK CR 8, ¶ 51, 248 P.3d at 378.

¶30 Applying Florez and Taylor to the present case, we conclude that the prosecutor's comments in the present case were borderline. He did not state that Appellant would be freed before he served the full term of any sentence imposed as found improper in Florez and Taylor. However, he inartfully described a sentence of life with the possibility of parole as 45 years while explaining that Appellant would have to serve 85% of his sentence before becoming eligible for parole. Life imprisonment is just that. It is not limited to a term of years.[8] Anderson v. State, 2006 OK CR 6, ¶ 24, 130 P.3d 273, 282-283. The only time that a life sentence is calculated at 45 years is when the Oklahoma Department of Corrections determines an inmate's eligibility for parole. Id. If a criminal defendant is not granted parole, he or she will serve the remainder of his or her natural life while serving a life sentence in Oklahoma. Since the prosecutor's comment was consistent with the requirement within 21 O.S.Supp.2015, § 13.1 that a defendant convicted of first degree murder must serve 85% of his sentence we find that the prosecutor did not misstate the law.

¶31 Reviewing the entire record in the present case, the cumulative effect of the prosecutor's comments did not deprive Appellant of a fair trial. Malone, 2013 OK CR 1, ¶ 43, 293 P.3d at 212. Thus, we find that prosecutorial misconduct did not deprive Appellant of a fundamentally fair trial. Proposition Two is denied.

¶32 In his third proposition of error, Appellant challenges defense counsel's effectiveness. This Court reviews ineffective assistance of counsel claims under the two-part test mandated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Ashton v. State, 2017 OK CR 15, ¶ 55, 400 P.3d 887, 900. The Strickland test requires an appellant to show: (1) that counsel's performance was constitutionally deficient; and (2) that counsel's deficient performance prejudiced the defense. Id.

¶33 The Court begins its analysis with the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. Appellant must overcome this presumption and demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. Id., 466 U.S. at 689-90, 104 S.Ct. at 2065-66.

¶34 Appellant, first, argues that defense counsel's comments concerning the 85% Rule in closing argument constituted ineffective assistance. Defense counsel made a comment similar to the statement which the prosecutor had made. She stated:

There are two pieces of paper that are in your instruction packet that I think are ultimately very important in this state. The first one is Instruction Number 50 and it explains exactly what the State just told you, that life is 45 years, that at 85 percent that's 38 years and three months. Let me be very clear, it's not an automatic bounce.

That's just your first attempt at parole and even if it's granted, it doesn't mean you're getting out. Most likely those sentences on an 85 percent will do almost all of the time. Life is 45 years. Like I said, Marcus will be 67 when he reaches just the parole point for the first opportunity. He will be in his seventies when he's served the full 45.

The majority of defense counsel's argument accurately stated the law as to the 85% Rule and parole eligibility. Counsel effectively conveyed to the jurors that parole was not at all guaranteed and the odds were that Appellant would serve his sentence in its entirety. However, defense counsel compounded the prosecutor's inartful comment when she equated serving a life sentence in full through service of 45 years.

¶35 Since adopting Instruction Number 10-13B, OUJI-CR(2d)(Supp.2006), this Court has repeatedly had to address the issue of practicing attorneys misapprehending what constitutes a life sentence. As imprisonment for life is self-descriptive, we can only conclude that the instruction is somehow confusing trial court practitioners during the throes of trial.[9] Accordingly, we find that the instruction should be modified as set forth below:

A person convicted of [Specify Crime in 21 O.S. Supp. 2015, § 13.1] shall be required to serve not less than eighty-five percent (85%) of the sentence imposed before becoming eligible for consideration for parole and shall not be eligible for any credits that will reduce the length of imprisonment to less than eighty-five percent (85%) of the sentence imposed.

If a person is sentenced to life imprisonment, the calculation of eligibility for parole is based upon a term of forty-five (45) years, so that a person would be eligible for consideration for parole after thirty eight (38) years and three (3) months. However, if a person is not granted parole, he or she will be imprisoned for the remainder of his or her natural life while serving a sentence of life imprisonment.

Although there is no need to further define what constitutes a life sentence, the additional sentence within this instruction may help trial attorneys to maintain their course as they balance the many nuances of jury trial. See Skinner v. State, 2009 OK CR 19, ¶ 41, 210 P.3d 840, 855 (finding no error in trial court's refusal to instruct jury regarding meaning of a life sentence); Fairchild v. State, 1999 OK CR 49, ¶ 90, 998 P.2d 611, 629 (affirming trial court's refusal to instruct on meaning of life sentence and meaning of sentence of life without possibility of parole).

¶36 In the present case, we must determine whether counsel's performance prejudiced the defense. See Ashton, 2017 OK CR 15, ¶ 57, 400 P.3d at 901 ("When a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed."). To demonstrate prejudice an appellant must show that there is a reasonable probability that the outcome of the trial would have been different but for counsel's unprofessional errors. Id. "The likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112, 131 S.Ct. 770, 792, 178 L.Ed.2d 624 (2011).

¶37 Reviewing the record, we find that Appellant has not shown that there is a reasonable probability that the outcome of the trial would have been different had counsel not equated a life sentence with service of 45 years. The evidence at trial strongly supported the jury's determination that Appellant should be imprisoned for life without the possibility of parole. Appellant brazenly threatened to blow Thomas Bryan's head off and continued to follow through on this threat until he shot Bryan's companion, Leland Mitchell, through the forehead. Despite admitting that he was safe at his own home and had time to cool off from the initial confrontation, Appellant continued to pursue Bryan and attempt to kill him. Mitchell was wholly uninvolved in the circumstances and was simply a guest in Bryan's home. Appellant's act of murdering Mitchell occurred after his former conviction of a felony. Based upon the facts of this case, we find that defense counsel's comment did not prejudice Appellant's defense. Therefore, we find that Appellant has not shown that he was denied the effective assistance of counsel.

¶38 Second, Appellant argues that defense counsel was ineffective for failing to object to the instruction he challenges in Proposition One. We determined in that Proposition that Appellant had not shown that plain and reversible error had occurred. As such, we find that Appellant has not shown a reasonable probability that the outcome of the trial would have been different but for counsel's failure to raise the challenge now raised on appeal. Ashton, 2017 OK CR 15, ¶¶ 58-59, 400 P.3d at 901; Glossip v. State, 2007 OK CR 12, ¶¶ 110-12, 157 P.3d 143, 161.

¶39 As Appellant has failed to establish ineffective assistance of counsel under Strickland, we find that no relief is required. Proposition Three is denied.

¶40 In his fourth proposition of error, Appellant contends that the trial court should have suppressed the recording of his in custody admissions to Detective Ritter. He argues that his waiver of rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) was not knowing because he had not taken his prescribed mental health medication that day and was suffering from the effects of schizophrenia during the interview. Appellant filed a pretrial motion seeking to suppress his statements to Detective Ritter based upon these grounds. The trial court held a hearing pursuant to Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), heard Detective Ritter's testimony and watched the recording of Ritter's interrogation of Appellant. The trial court determined that Appellant had knowingly and voluntarily waived his rights under Miranda. The question of the voluntariness of Appellant's admissions was a fact question to be resolved by the jury and the trial court instructed the jury accordingly.

¶41 This Court reviews the trial court's denial of a motion to suppress for an abuse of discretion. Sanders v. State, 2015 OK CR 11, ¶ 17, 358 P.3d 280, 285. This is the same standard of review applied to both a trial court's ruling from a Jackson v. Denno hearing and a trial court's decision to admit evidence at trial. Davis v. State, 2011 OK CR 29, ¶ 156, 268 P.3d 86, 125; Davis v. State, 2004 OK CR 36, ¶ 34, 103 P.3d 70, 80. An abuse of discretion is any unreasonable or arbitrary action taken without proper consideration of the facts and law pertaining to the matter at issue or a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented. Neloms v. State, 2012 OK CR 7, ¶ 35, 274 P.3d 161, 170.

¶42 Applying this standard to the present case, we find that the trial court did not abuse its discretion. A person may waive the rights set out in Miranda "'provided the waiver is made voluntarily, knowingly and intelligently.'" Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140--41, 89 L.Ed.2d 410 (1986), quoting Miranda, 384 U.S. at 444, 475, 86 S.Ct. at 1612, 1628.

The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Id., (quotations and citations omitted). As Appellant does not challenge the voluntariness of either his waiver or his statements to the officers, we review the totality of the circumstances to determine whether he understood the rights at stake and the consequences of waiving them. Webster v. State, 2011 OK CR 14, ¶ 59, 252 P.3d 259, 276;

¶43 Detective Ritter testified that he interviewed Appellant in an interview room at the Detective Division with Detective Frazier. Ritter stated that he gave Appellant what is commonly known as the Miranda warning and advised him of his rights prior to having a substantive conversation with him. Appellant indicated that he understood each of the rights, waived them, and agreed to speak with the officers.

¶44 Ritter further testified that Appellant disclosed during the interview that he had mental health issues and had not taken his medication the preceding day but Ritter continued with the interview because Appellant was communicative and seemed fine. Ritter advised that Appellant appeared to understand where he was at and what was going on. Based upon his experience and training, Ritter did not believe that Appellant was under the influence of drugs or alcohol. Appellant responded appropriately to Ritter's questions.

¶45 The Rights Waiver form that Ritter used to advise Appellant of his rights is also within the record on appeal. The form accurately sets forth the rights announced in Miranda. Appellant's initials are next to each of the listed rights and his signature is affixed under the declaration: "I have read and understood my rights. I am willing to answer questions and understand that I may stop answering questions at any time."

¶46 The recording of the interview corroborated Ritter's testimony. The recording contains both an audio and visual account of the interrogation. Detective Ritter and Detective Frazier interviewed Appellant around 5:45 a.m. on December 16, 2015. Appellant appeared alert and attentive throughout the interview. Ritter first ascertained that Appellant could read, write, and understand his questions. Appellant advised Ritter that he was not under the influence of drugs or alcohol. He had last smoked marijuana approximately twelve hours earlier. Appellant indicated that he could read and write. He further affirmed that he understood Ritter. When Ritter read Appellant his Miranda rights from the Rights Waiver form Appellant actively read along with the detective and acknowledged that he understood each of the rights. He eagerly expressed his desire to speak with the officers and signed the Rights Waiver form.

¶47 Appellant admitted driving the green Saturn but wholly denied any knowledge of a confrontation with Thomas Bryan or anyone else that day. He denied speeding in his car and disallowed that a guy on a motorcycle had come up to him complaining about his driving. Even after Ritter confronted Appellant with the fact that his fifteen year old brother had confirmed that the confrontation had occurred, Appellant continued to deny any memory of such an encounter. Eventually, he asked Ritter to allow him to think and after rubbing his temples for several minutes admitted that such a confrontation had occurred. Appellant complained that Bryan had called him the N-word but related that he had gone back to his home and played video games afterward. Appellant further admitted that he spoke to Lori Mangel but claimed that he had told her that everything was cool. In an apparent attempt to further confront Appellant, Ritter asked Appellant if he had mental health issues. Appellant indicated, "A little bit" and asserted that he had Schizophrenia, Bipolar, OCD, and ADHD. Appellant advised that he was on medication through a local clinic but very confidently stated that he regularly took his medication. When Ritter asked if Appellant had taken his medication that day, Appellant indicated that he had not. However, he confidently asserted that he had taken it the day before. Ritter continued to interview Appellant without any incident or problem.

¶48 It is truly questionable whether Appellant actually has mental health issues. Forensic Psychologist, Dr. Peter Rausch, of the Oklahoma Forensic Center evaluated Appellant during the competency proceedings held in the case before trial. Appellant asserted that he had Schizophrenia, Bipolar, and ADHD but could not relate any symptoms associated with these conditions. Dr. Rausch did not observe any legitimate signs of mental illness, cognitive impairment, or neurological disease while evaluating Appellant. Instead, Dr. Rausch indicated that Appellant tested excessively high above the cut score for malingering strongly suggesting that he was feigning the symptoms of mental illness. Based upon Rausch's report, Appellant was found competent to stand trial.

¶49 Nothing in the record suggests that Appellant's mental health status prevented him from understanding the rights at stake and the consequences of waiving them. Appellant was communicative and appeared fine. He responded appropriately to Ritter's questions but simply refused to confess his involvement in Mitchell's death until confronted with the cold hard reality of the circumstances. Appellant appeared wholly goal oriented. After he confessed Appellant openly admitted that he had initially "lied" to Ritter but asserted that he was just trying to scare Bryan. All of Appellant's statements and actions on the recording suggest that he understood the rights at stake and the consequences of waiving them.

¶50 Based upon this record, we must conclude that the trial court's determination that Appellant knowingly waived his rights under Miranda was not clearly against the weight and effect of the facts presented. Proposition Four is denied.

¶51 In his fifth proposition of error, Appellant claims the combined errors in his trial denied him the right to a constitutionally guaranteed fair trial. When there have been numerous irregularities during the course of a trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors is to deny the defendant a fair trial. Bechtel v. State, 1987 OK CR 126, ¶ 12, 738 P.2d 559, 561. However, a cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by the appellant. Engles v. State, 2015 OK CR 17, ¶ 13, 366 P.3d 311, 315; Williams v. State, 2001 OK CR 9, ¶ 127, 22 P.3d 702, 732. We have not identified any error during the course of the trial in the present case. Therefore, no new trial or modification of sentence is warranted and this assignment of error is denied.

DECISION

¶52 The Judgment and Sentence of the District Court is hereby AFFIRMED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2018), the MANDATE is ORDERED issued upon the delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF TULSA COUNTY

THE HONORABLE DOUG DRUMMOND, DISTRICT JUDGE

 
 
 
 APPEARANCES AT TRIAL
 
 
 APPEARANCES ON APPEAL
 
 
 
 
 
 SOFIA JOHNSON
 REBECCA NEWMAN
 ASST. PUBLIC DEFENDERS
 TULSA COUNTY
 423 S. BOULDER WEST, STE 300
 TULSA, OK 74103
 COUNSEL FOR DEFENDANT
 
 
 
 NICOLE DAWN HERRON
 ASST. PUBLIC DEFENDER
 TULSA COUNTY
 423 S. BOULDER WEST
 TULSA, OK 74103
 COUNSEL FOR APPELLANT
  
 
 
 
 
 
 KEVIN GRAY
 ASST. DISTRICT ATTORNEY
 500 SOUTH DENVER, STE 900
 TULSA, OKLAHOMA 74103
 COUNSEL FOR THE STATE
 
  
 
 
 
 MIKE HUNTER
 ATTORNEY GENERAL OF OKLA.
 DONAL D. SELF
 ASST. ATTORNEY GENERAL
 313 N.E. 21ST ST.
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR THE STATE
 
 
 

OPINION BY: LUMPKIN, P.J.

LEWIS, V.P.J.: Specially Concur
HUDSON, J.: Concur
KUEHN, J.: Dissent
ROWLAND, J.: Concur

FOOTNOTES

[1] The State charged Appellant in Count 2 with Shooting with Intent to Kill (21 O.S.2011, § 652(A)) but the jury found him guilty of the lesser offense of Assault with a Dangerous Weapon.

[2] Appellant is required to serve not less than 85% of his sentence prior to becoming eligible for consideration for parole. 21 O.S.Supp.2015, § 13.1.

[3] Tr. 369.

[4] Tr. 533.

[5] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

[6] State's Exhibit Number 66.

[7] State's Exhibit Number 66.

[8] Lawyers continue to confuse the punishment set out in our statutes with the administrative rules of the Pardon and Parole Board. Under our penal statutes, a life sentence means the natural life of the offender. The fact that the Pardon and Parole Board has arbitrarily set forty-five (45) years as the number the Board will use to comply with the "Forgotten Man Act", 57 O.S.Supp.2013 § 332.7, does not affect the actual sentence; that number affects only when the Board will consider the inmate for purposes of parole.

[9] Despite our opinions in Florez and Taylor, this Court has continued to be presented with cases wherein practicing attorneys misstate the effects of the 85% Rule on a life sentence. See Bramlett v. State, 2018 OK CR 19, ¶ 40, ___ P.3d ___ (finding prosecutor misstated the law when he declared that defendant would only serve 38 years on a life sentence); Lee v. State, 2018 OK CR 14, ¶ 10, ___ P.3d ___ ("Telling the jury that a life sentence is forty-five (45) years in prison is a misstatement of the law.").

LEWIS, VICE PRESIDING JUDGE, SPECIALLY CONCURS: 

¶1 Both the Opinion of the Court and the special writing by Judge Kuehn are well researched and written. I, however, write specially to point out that the issue presented in proposition one is not as complicated as it seems.

¶2 Appellant simply complains that the trial court's transferred intent instruction reduced the intent element of first degree murder from malice aforethought (a deliberate intent to take the life of a human being) to intent to injure or assault by including injure and assault in the first line of the instruction. Appellant argues, therefore, that he may have been convicted of first degree murder without the jury finding that he caused the death of the victim with malice aforethought.

¶3 His argument is based on the premise that, in his interpretation, the instruction could have been read, in abstract, to mean if a defendant intends to injure "A" and by mistake or accident kills "B" the element of intent is satisfied even though the defendant did not intend to kill "B." In such case the intent to injure is transferred from "A" to "B."

¶4 Our review of this alleged instructional error is limited to a review of plain error only as Appellant failed to object to the instruction given. Hogan v. State, 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923 (holding that a failure to object to instructions forfeits review unless the appellant can show plain error).

¶5 I believe that Appellant's argument has merit and the instruction given constitutes error, as the instruction given could be construed to read that an intent to injure "A" might be transferred to an intent to kill "B." The Oklahoma uniform instruction was not the best choice for the facts in this case, and the trial court did not remedy the confusion by leaving injure and assault options in the instruction.[1]

¶6 Trial courts should be reminded to omit words within brackets in instructions which do not apply to the facts of a particular case. In this case, the State did not allege any intent to injure or assault with reference to the malice murder count and transferred intent was not applicable to the assault with a dangerous weapon count. I am, however, confident that the instruction did not cause any harm to Appellant in this case.

 

¶7 The jury was fully instructed on the elements of first degree malice murder and the requisite definitions of those elements. The jury was also instructed on the elements of the lesser offense of second degree depraved mind murder. First degree malice murder requires specific intent and second degree depraved mind murder does not. The transferred intent doctrine applies to specific intent crimes against the person. It would have been impossible for the transferred intent instruction to cause the jury to convict Appellant of first degree murder if he were actually guilty of second degree murder. I agree, therefore, that the instruction given was harmless.

¶8 I believe this Court agrees that Oklahoma's first degree murder statute only requires that a defendant cause a death of another with malice aforethought (the intent "to take away the life of a human being"). 21 O.S.2011, § 701.7(A). When a person acts with this intent and causes the death of another, the person is guilty of first degree malice murder. Under a clear reading of the statute, it is of no consequence whether a defendant intended to kill one specific individual but killed someone else by mistake or accident.

¶9 Evidence was overwhelming that Appellant actually intended to kill the person at whom he discharged his shotgun. Therefore, his intent to kill the person killed was not legally transferred from an intended victim to the actual victim. This Court has not expanded the transferred intent doctrine to a situation where a defendant hurls a blow at an intended victim thinking that victim is someone else, i.e. "bad eyesight" which sounds similar to a "bad aim." Public policy dictates, however, that a defendant not avail himself of a defense based on either "bad eyesight" or "bad aim" in malice murder cases.[2] One method of upholding that public policy is to utilize the doctrine of transferred intent to prevent a defendant from claiming that the person killed was not the intended victim. In conclusion, I, too, would affirm the Judgments and Sentences in this case.

FOOTNOTES

[1] I would encourage the committee on uniform criminal jury instructions to examine the current Oklahoma Criminal Instruction on transferred intent. Other Courts have used similar, but different language to convey the same doctrine. A cursory search reveals the following:

If you find that [the defendant] intended to [assault/injure/kill] a person other than [victim] and by mistake or accident [assaulted/injured/killed] [victim] the element of intent is satisfied, even though [the defendant] did not intend to [assault/injure/kill] [victim]. In such a case, the law regards the intent as transferred from the original intended victim to the actual victim.

See Nebraska v. Moore, 740 N.W.2d 52, 56 (Neb.App.2007), affirmed on other grounds in Nebraska v. Moore, 751 N.W.2d 631 (Neb.2008). Also:

When one intends to kill or injure a certain person, and by mistake or accident kills a different person, the crime, if any, is the same as though the original intended victim had been killed. In such a case, the law regards the intent as transferred from the original intended victim to the actual victim.

See Uniform Jury Instruction-Criminal 14-255 New Mexico Rules Annotated (NMRA) 1999

[2] Also, a defendant should neither avail himself of a defense nor receive a discount when his well-aimed shot kills the intended victim and also kills another person.

KUEHN, J., DISSENTING:

¶1 I dissent to the analysis of Proposition I, and to the conclusion that the comments on the 85% Rule, complained of in Proposition II, were harmless beyond a reasonable doubt. I believe the trial court's instruction on "transferred intent" was a correct statement of the law and appropriate in this circumstance. I believe the attorneys' misstatements of the 85% Rule could have affected the jury's sentence recommendation, and would affirm the conviction but remand for resentencing.

¶2 Appellant was convicted in Count 1 of intentionally killing Mitchell, the friend of Appellant's neighbor, Bryan, by intentionally firing a shotgun into a vehicle Mitchell was driving.[1] Appellant eventually admitted to police that he shot in the direction of the car Mitchell was driving (he actually fired more than once, and hit Mitchell in the center of the forehead from a distance of about 120 yards). The shooting occurred at night, such that it would have been difficult for Appellant to see inside the car. Although the trial court noted that Appellant's various explanations of what happened were not consistent, it nevertheless included instructions on self-defense, and on depraved-mind murder as a lesser related offense. Rejecting these options, the jury concluded that Appellant fired his weapon into Mitchell's vehicle with an intent to kill.

¶3 The trial court instructed the jury on the concept of "transferred intent," OUJI-CR (2nd) No. 4-11 (Instruction No. 20). Neither party objected to this instruction. In fact, both parties discussed the implications of the instruction in closing argument. The State never claimed Appellant intended to kill Mitchell. Appellant was angry with his neighbor, Bryan, not Mitchell, and there was no evidence he intended to harm Mitchell. The prosecutor explained that under the doctrine of transferred intent, the fact that Appellant killed someone other than his intended victim did not excuse his conduct. Based on Appellant's conflicting accounts, defense counsel advanced a mixture of self-defense and accident, claiming Appellant was in reasonable fear of his life, but that he only meant to scare Bryan. Defense counsel claimed that because Appellant had a legal right to use deadly force to protect himself, killing Mitchell was an unfortunate accident that was excusable under the law.

¶4 In Proposition I, Appellant objects for the first time to the wording of Instruction 20. He concedes a transferred-intent instruction was appropriate, but claims the court's failure to properly edit the wording of the Uniform Instruction to fit these particular facts prejudiced him. Specifically he claims the instruction relieved the State of its duty to prove any intent to kill on his part. In Proposition III, he faults trial counsel for not recognizing this textual flaw.

¶5 The Majority's conclusion that the instruction was not warranted in this case is both incorrect and irrelevant. I appreciate the distinction between two classic fact patterns: one where the defendant accidentally kills someone other than his intended victim (the "bad aim" scenario), the other where he kills someone he mistakenly believes is his intended victim (the "mistake of fact" scenario). But however one labels these scenarios, the fact remains that neither of them excuses the defendant's conduct under Oklahoma law.

¶6 To prove premeditated murder, the State must establish the unlawful killing of another human with malice, and malice is the "deliberate intention unlawfully to take away the life of a human being." 21 O.S.Supp.2012, § 701.7(A); see also OUJI (2nd) No. 4-61. There is no requirement that the defendant's malice be directed at the person who was killed. Jackson v. State, 2016 OK CR 5, ¶ 8, 371 P.3d 1120, 1122. That point may seem obvious to lawyers, but it may not be so obvious to the layman. Hence an instruction on the concept may be entirely appropriate in cases like this where a third party is inadvertently harmed, and it is appropriate regardless of whether the third party's harm was due to "bad aim" (accident) or "mistake of fact" (mistake). Over a century ago, this Court recognized the technical distinction between the two scenarios, but found no legal difference in the result. Fooshee v. State, 1910 OK CR 86, 3 Okl.Cr. 666, 108 P. 554, 560.[2] What's more, OUJI-CR (2nd) No. 4-11 encompasses both scenarios, and reaches the same result regardless of whether the victim was harmed by "mistake" or "accident" OUJI-CR (2nd) No. 4-11.[3]

¶7 Even if the Majority were correct that the instruction was unwarranted here, the fact remains, the jury received it. The real issues are whether the instruction stated the applicable law, and if not, whether it renders the jury's verdict unreliable. I believe the instruction was appropriate to these facts and correctly stated the law. In fact, the trial court's editing made the instruction a more correct statement of the law (as applied to these facts) than the text of the Uniform Instruction itself. Uniform Instruction No. 4-11 contains alternatives to be selected based on what the defendant sought to do (assault, battery, or homicide), and the fate of the person mistakenly or accidentally harmed:

If you find that the defendant intended to kill/ injure/ assault [Name of Intended Victim], and by mistake or accident injured/ assaulted [Name of Actual Victim], the element of intent is satisfied even though the defendant did not intend to kill/ injure/ assault [Name of Actual Victim]. In such a case, the law regards the intent as transferred from the original intended victim to the actual victim.

Id. The trial court altered the text to account for the fact that Mitchell was killed rather than injured, but left alternatives for Appellant's original intentions:

If you find that the defendant intended to kill/ injure/ assault THOMAS BRYAN, and by mistake or accident killed LELAND MITCHELL, the element of intent is satisfied even though the defendant did not intend to kill LELAND MITCHELL. In such a case, the law regards the intent as transferred from the original intended victim to the actual victim.

¶8 Appellant complains that the trial court left all three intent options in the first line of the text, but this was entirely proper under the facts.[4] While the State of course alleged that Appellant intended to kill Bryan, Appellant's statements to police disputed that claim; he insisted that he only meant to scare Bryan. In any event, the instruction as edited by the trial court certainly did not absolve the State from proving any criminal intent on Appellant's part, as he now claims. The first words of the instruction -- "If you find that the defendant intended to..." -- speak for themselves. The instruction merely states this: Whatever the jury may believe Appellant was endeavoring to do to Bryan (scare him, kill him), his culpability is not mitigated ("is satisfied even though") the person ultimately harmed by his conduct was someone else. That certainly comports with the law of this State.[5] Appellant's jury was properly instructed on the elements of premeditated murder and self-defense. Instruction No. 20 supplemented those instructions, but did not distort or contradict them. I find no reasonable probability that Instruction No. 20, as edited, could have contributed to an unreliable verdict, and no reason to fault trial counsel for not objecting to its wording.[6]

¶9 As to Proposition II, both the prosecutor and defense counsel repeatedly told the jury that "life means 45 years." Their explanations were at best unclear and at worst misstatements of the law. The prosecutor contrasted a life-without-parole sentence -- one where "you never get out," "that will be it," "he will never leave the penitentiary" -- with a straight life sentence, which "means 45 years." Defense counsel's own closing comments were just as misleading. She told the jury, "Most likely those sentence[d] on an 85% crime will do almost all of the time. Life is 45 years." Defense counsel concluded by asking the jury to impose a life sentence for murder, because "45 years is a life and that is the appropriate punishment for this crime." These comments can be construed as saying that a life sentence is, for all purposes, automatically transformed into a sentence of 45 years -- and that even if the defendant does not receive parole after 85% of that term, he will be released in 45 years.[7] The Majority is uncomfortable enough to suggest amending the applicable OUJI instruction, and I wholeheartedly agree with that proposal. But I am not confident that the comments by both attorneys here did not influence the jurors' understanding of the law and recommendation on sentence. Appellant's crime was reprehensible, and the results were tragic, but I would remand this case for resentencing.

FOOTNOTES

[1] In Count 2, Appellant was charged with Shooting with Intent to Kill based on a prior incident where he shot at Bryan; the jury convicted him of Assault with a Dangerous Weapon as a lesser alternative. That count is not affected by this analysis.

[2] By the express terms of our statute the unlawful killing of a human being, committed with a premeditated design to effect his death, or with a premeditated design to effect the death of any other person, is murder. Certainly this definition will cover a case where one person unlawfully assaults another with a premeditated design to kill him, and in the affray kills a third person. But it is not limited in its application to that character of case alone. Suppose that A. in the nighttime lies in wait for the purpose of killing B. as the latter passes by; C. comes along, and A., mistaking him in the darkness for B. shoots C. and kills him, but with the premeditated design to kill B. Would not that be murder? And yet no assault was committed upon B.; he may have been miles away. It is true that in such case an indictment charging the homicide to have been committed with a premeditated design to kill C. would be good, and under the doctrine of implied malice would be sustained by proof of the actual facts. But if the prosecution knew the facts and alleged them -- A.'s actual and premeditated design to kill B., and his assault upon and slaying of C. with such premeditated design to kill B. -- would any one say that such indictment was not good, and that proof of the facts thus alleged would not support a conviction? ... And an indictment which charges the shooting and killing of the deceased, and alleges that the same was done without authority of law, and with a premeditated design to kill another person, naming him, fulfills the requirements of the statute; and, if those allegations are sustained by the proof, a conviction thereunder must stand.

Fooshee, 1910 OK CR 86, 3 Okl.Cr. 666, 108 P. 554, 560 (emphasis added).

[3] One esteemed legal commentator believes the notion that a defendant's intent is "transferred" from the intended victim to the accidental victim is a solution in search of a problem -- it may be relevant in tort, but "has no proper place in criminal law," where it is "a misleading half-truth, often given as an improper reason for a correct result, but incapable of strict application." Perkins, Criminal Law (2d ed. 1969) at 822. With regard to malice murder, Perkins believes there is no need to resort to the concept unless, for some reason, the jurisdiction requires that the defendant's intent to kill be directed at the person killed. Id. at 827. Perkins also recognizes the "mistake of fact" cases as falling in the same general category:

In case of an attack made upon the wrong person as a result of mistaken identity, needless to say, the law will recognize that the assailant "meant to murder the man at whom he shot" although he had in mind the name of another man who was not there.

Id. The Majority's reference to Professor LaFave on the subject is in complete accord:

[The defendant's] conceivable argument that his mistake of fact (as to the victim's identity) somehow negatives his guilt of murder would be unavailing: his mistake does not negative his intent to kill; and on the facts as he supposes them to be [he] is just as guilty of murder as he is on the facts which really exist.

LaFave, Substantive Criminal Law § 6.4(d) at 48 (3rd ed. 2017).

[4] A glaring problem with the Uniform Instruction is that it does not contemplate the situation where -- as here -- the unintended victim dies. This may be because the Instruction is placed in the chapter on Assault and Battery, not Homicide. The trial court here wisely and correctly edited the instruction to account for the fact that Mitchell was killed, not injured or assaulted, by mistake or accident. The Instruction should be amended to include the situation where the victim dies, or a similar Instruction covering that scenario should be included in the chapter on homicides.

[5] Of course I also disagree with the Majority's conclusion (Slip Op. at 9) that the instruction was error because it "permitted the jury to find that Appellant had the intent to kill Mitchell based on a pre-existing intent to injure or assault Bryan." The State never claimed Appellant had any intent to kill Mitchell; our law does not require it, and the instruction does not suggest it.

[6] See Short v. State, 1999 OK CR 15, ¶ 46, 980 P.2d 1081, 1099 (in malice murder prosecution, where the victim was someone other than those the defendant sought to harm, jury instruction explaining that "the intent to kill as to one person is sufficient to convict as to another person actually harmed" did not absolve the State of its burden of proof).

[7] For example, the prosecutor told the jury, "Life in the State of Oklahoma means 45, which means that you are eligible for parole after 38 years and three months." The first clause is a patent misstatement of the law, even if the second one is technically correct. The Majority finds no harm because these were 85% crimes, but that is not the problem here. The Uniform Instruction on the 85% Rule is a correct statement as far as it goes, but still leaves room for jurors (and attorneys) to conclude that "life means 45 years" is a rule all its own. Telling a jury that the defendant will be released after 85% of his sentence (the Florez situation) is a different error from suggesting that regardless of parole, a life sentence equals 45 years.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1994 OK CR 40, 876 P.2d 690, SIMPSON v. STATE
Discussed at Length
 1909 OK CR 160, 106 P. 982, 3 Okl.Cr. 281, Rea v State
Cited
 1909 OK CR 161, 105 P. 386, 3 Okl.Cr. 281, Rea v State
Cited
 1910 OK CR 86, 108 P. 554, 3 Okl.Cr. 666, Fooshee v State
Discussed at Length
 2001 OK CR 9, 22 P.3d 702, 72 OBJ 1068, WILLIAMS v. STATE
Discussed
 2004 OK CR 36, 103 P.3d 70, DAVIS v. STATE
Discussed
 2006 OK CR 6, 130 P.3d 273, ANDERSON v. STATE
Discussed
 2006 OK CR 19, 139 P.3d 907, HOGAN v. STATE
Discussed
 2007 OK CR 12, 157 P.3d 143, GLOSSIP v. STATE
Discussed
 2009 OK CR 19, 210 P.3d 840, SKINNER v. STATE
Discussed
 2010 OK CR 21, 239 P.3d 156, FLOREZ v. STATE
Discussed at Length
 2010 OK CR 25, 243 P.3d 461, BURGESS v. STATE
Discussed
 2011 OK CR 8, 248 P.3d 362, TAYLOR v. STATE
Discussed at Length
 2011 OK CR 14, 252 P.3d 259, WEBSTER v. STATE
Discussed
 2011 OK CR 29, 268 P.3d 86, DAVIS v. STATE
Discussed
 2012 OK CR 7, 274 P.3d 161, NELOMS v. STATE
Discussed
 2013 OK CR 1, 293 P.3d 198, MALONE v. STATE
Discussed at Length
 2015 OK CR 11, 358 P.3d 280, SANDERS v. STATE
Discussed
 2015 OK CR 17, 366 P.3d 311, ENGLES v. STATE
Discussed
 2016 OK CR 5, 371 P.3d 1120, JACKSON v. STATE
Discussed at Length
 2016 OK CR 9, 372 P.3d 508, STEWART v. STATE
Discussed
 2016 OK CR 10, 373 P.3d 118, REED v. STATE
Discussed
 2017 OK CR 15, 400 P.3d 887, ASHTON v. STATE
Discussed at Length
 2018 OK CR 14, 422 P.3d 782, LEE v. STATE
Cited
 2018 OK CR 19, 422 P.3d 788, BRAMLETT v. STATE
Cited
 1999 OK CR 49, 998 P.2d 611, Fairchild v. State
Discussed
 1998 OK CR 33, 965 P.2d 955, 69 OBJ 2028, Turrentine v. State
Discussed
 1999 OK CR 15, 980 P.2d 1081, 70 OBJ 1223, Short v. State
Discussed at Length
 1987 OK CR 126, 738 P.2d 559, BECHTEL v. STATE
Discussed
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 13.1, Required Service of Minimum Percentage of Sentence - Offenses Specified
Discussed at Length
 21 O.S. 152, Persons Capable of Committing Crimes - Exceptions
Cited
 21 O.S. 645, Assault, Battery, or Assault and Battery with Dangerous Weapon
Cited
 21 O.S. 652, Shooting with Intent to Kill - Assault and Battery with Deadly Weapon, etc.
Cited
 21 O.S. 701.7, Murder in the First Degree
Discussed at Length
Title 57. Prisons and Reformatories
 Cite
Name
Level

 57 O.S. 332.7, Persons Eligible for Consideration for Parole - Inquiry - Recommendation to Governor - Administrative Parole
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA